**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ARÇELIK, A.Ş. | |
| Plaintiff, | |
| v. | C. A. No. _____ |
| E. I. DU PONT DE NEMOURS AND COMPANY, | |
| Defendant. | **JURY TRIAL DEMANDED** |

## COMPLAINT

1.     Plaintiff Arçelik, A.Ş. ("Arcelik"), a major consumer appliance manufacturer, brings this lawsuit against Defendant E.I. DuPont de Nemours and Company ("DuPont") for damages Arcelik suffered as a result of a faulty DuPont product that was a key component in clothing dryers made and sold by Arcelik to the public.  A number of these dryers caught fire when being used by Arcelik's customers as a result of the defects in DuPont's product.  After learning of the fires, Arcelik initiated a costly recall of the affected dryers and compensated its customers for fire damage they had suffered.  Despite the fact that DuPont has itself concluded that its product was defective, DuPont has refused to compensate Arcelik for damages it suffered as a result of DuPont's manufacturing and quality control failures.

## NATURE OF THE ACTION

2.     Arcelik manufactured electric tumble dryers that utilized capacitors that contained Zytel—a plastic resin manufactured, marketed, and sold by DuPont.  Arcelik selected these components in reliance on DuPont's representations that Zytel had various characteristics, including the ability to operate under conditions of high heat and humidity, which made it suitable for use in electrical components incorporated into Arcelik's dryers.

3.      In late 2012, those tumble dryers began catching fire in the homes of Arcelik customers, damaging property, risking personal injury, and subjecting Arcelik to significant remediation expenses.  Multiple investigations determined that the electrical fires were caused by a series of defective batches of Zytel which were contaminated in a way that degraded its electrical insulation capabilities under conditions of high heat and humidity.

4.      The ability of Zytel to insulate electricity under such conditions was a feature heavily touted by DuPont, in various different ways, in its promotion of the product.  It was also a critical feature for Arcelik: it was these capabilities that made Zytel appropriate for use in Arcelik's dryers.  The problems with the bad batches of Zytel sold by DuPont made the product a fire hazard.

5.      Various DuPont representations regarding Zytel were false with respect to these defective batches.  For example, DuPont made repeated representations that Zytel was suitable for use in low-voltage electric applications, including in hot and humid environments, and made representations as to the particular electrical properties of Zytel, which—had they been true—would have rendered Zytel suitable for Arcelik's use.  Those representations were not true with respect to the bad batches of Zytel produced by DuPont.

6.      Moreover, these DuPont representations were made with a reckless disregard for the truth: Despite DuPont's repeated representations indicating that Zytel was suitable for the use to which Arcelik put it, DuPont in fact had *no process whatsoever* for testing the electrical resistivity of Zytel, or for detecting catastrophic defects such as occurred here.  DuPont simply had no way of knowing whether representations it was making about the electrical insulation capabilities of its product were true with respect to any particular batch of Zytel.

7.      Arcelik reasonably trusted DuPont's word about Zytel's characteristics, as DuPont encouraged end users like Arcelik to do in touting its purportedly world-class testing and quality control processes.  DuPont made a series of bad batches of Zytel that did not have the qualities promised by DuPont.  Had the Zytel had those promised qualities, Arcelik's dryers would not have caught on fire.  DuPont should be held responsible for Arcelik's losses.

## PARTIES

8.      Plaintiff Arçelik A.S. is a household-appliance manufacturing company with its principal place of business at Karaağaç Caddesi No: 2-6, Sütlüce 34445, İstanbul, Turkey.

9.      Defendant E. I. du Pont de Nemours and Company is a Delaware corporation with its principal place of business at 1007 Market Street, Wilmington, Delaware 19898.

## JURISDICTION AND VENUE

10.      Jurisdiction of all claims is appropriate in the United States District Court for the District of Delaware pursuant to 28 U.S.C. § 1332 because there is diversity of citizenship between Plaintiff and Defendant and the amount in controversy exceeds $75,000, exclusive of interest and costs.

11.      Venue as to all claims is appropriate in the United States District Court for the District of Delaware pursuant to 28 U.S.C. § 1391(b)(1) because Defendant resides in this district.  Venue is also appropriate under 28 U.S.C. § 1391(b)(2) because DuPont maintains its principal place of business in Delaware, at which place it engaged in research, design, production, marketing, and sales operations relating to Zytel.  Alternatively, venue is appropriate under 28 U.S.C. § 1391(b)(3) because this Court has personal jurisdiction over Defendant.

**FACTS**

Arcelik and the Dryer Fires

12.     Founded in 1955, Arcelik manufactures and sells household appliances under multiple brands in over 100 countries.  One of Arcelik's product lines includes electric tumble dryers.  At all times relevant to this Complaint, Arcelik was engaged in the manufacturing and selling of Arcelik tumble dryers.

13.     In late 2012 and early 2013, Arcelik received reports that certain of its dryers were catching fire, causing property damage and presenting a serious safety hazard for hundreds of Arcelik customers.  The homes of a number of Arcelik customers were destroyed or damaged after their dryer burst into flames.

14.     In response to these reports, Arcelik issued a safety notice to its customers who had purchased affected dryers regarding a potential fire risk.  To minimize risk of further property damage and personal injury, Arcelik also implemented a voluntary recall process in European countries, including the United Kingdom and France, undertaking to replace and/or repair all affected dryers.  Arcelik also compensated customers for damage to property caused by the dryer fires.

The Dryer Capacitors

15.     Arcelik tumble dryers are household appliances that circulate heated air through a rotating drum to remove moisture from clothing.  These dryers utilize an electric motor which drives the rotating drum ("tumbler") and fan components.

16.     Electric capacitors are energy storing devices, whose purpose is to regulate and maintain the flow of electrical current to electric motors.  Capacitors store an electrical charge on two conductive plates separated by an insulating layer within the cylindrical case, and connect to

a circuit by way of two "terminal lugs" protruding from one end.  Arcelik purchased the capacitors used in the dryers at issue in this case from a German manufacturer, Epcos AG ("Epcos").

17.     The capacitors supplied by Epcos incorporated a plastic product known as Zytel, which was developed, manufactured, and marketed by DuPont and sold by DuPont, including through its global subsidiaries.

18.     Epcos used Zytel to mold exterior components of its capacitors.  Specifically, Zytel served as the material forming the "top disc" of the capacitor, the purpose of which is to electrically isolate the terminal lugs from each other and from the main aluminum case carrying the electrical charge.

19.     The plastic top disc seals the body of the capacitor case from the terminal lugs and also includes a "shield" that separates the terminals lug from each other, as the following illustration reflects:



"Top disc" sealing body of capacitor case from terminal lugs

"Shield" separating terminal lugs

20.     A key purpose of this design is to avoid arc fires.  Arc fires can occur when the insulating material breaks down, allowing electrical current to jump the gap between the two terminals, creating an intensely hot, flammable discharge.

21.     In 2006, VDE Testing and Certification Institute (a leading European product-safety institute) issued a safety certification for Epcos capacitors, indicating their suitability for

use in Arcelik dryers.  This certification included a material test report identifying Zytel as the

top-disc material in the capacitors.

Zytel and Importance of Electrical Resistivity

22.     Zytel is a polyamide plastic resin intended for injection molding within various

manufacturing applications.  It is one species of a large class of plastics derived from Nylon 66,

which is one of the most widely-used engineering polymers.  The applications of Nylon 66, and

Nylon 66 derivatives such as Zytel, can be extended by the incorporation of various filler

materials, or additives, which can serve to modify attributes such as strength, wear resistance,

chemical resistance, and flammability.

23.     Zytel is a Nylon 66 blend modified by the addition of 25% glass fibers for the

purpose of increasing the plastic's flame resistance.  As such, Zytel is particularly marketed by

DuPont for its flame retardant characteristics.  Indeed, in light of its flame resistance, Zytel is

well-known and commonly used in the mechanical support of live contacts in electrical

appliances where there needs to be insulation against electrical conductivity.

24.     In determining whether a plastic is suitable for electric use, engineers consider a

variety of characteristics, including the product's surface and volume resistivity, comparative

tracking index ("CTI"), High Voltage Arc Tracking Rate, as well as other thermal and structural

qualities.

25.     Electrical resistivity is an intrinsic property that quantifies how strongly a given

material opposes the flow of electric current.  Resistivity is the reciprocal measure of a material's

conductivity; thus, a low resistivity indicates a material that is conducive to electric current and

unsuitable for use in electrical settings that require insulation of electricity.  Resistivity may be

measured in terms of both surface resistivity (*e.g.*, the surface of the capacitor's top disc

supporting the terminals) and volume resistivity (*e.g.*, the plastic shield positioned between the two terminals of the capacitor).

26.     As explained in a DuPont Technical Report: "High volume resistivity guarantees that the material acts as an insulator. The volume resistivity test is often used in checking the uniformity of an insulating material, either to determine the uniformity of processing or to detect traces of impurities which affect the quality of the material and which may not be readily detected by other means.  It is also used to determine the effect of moisture on a material."

27.     In household electric appliances, sufficient surface and volume resistivity of the plastic components (based on the voltage rating of the appliance) is crucial to ensure electrical currents between the terminals will not travel across or through the insulating material, which can result in an arc-fire.  With regard to the particular capacitors supplied to Arcelik, the electrical characteristics of the polymer must be sufficient to insulate a certain level of current between the terminals, and to provide a certain level of insulation between the case and the terminals to prevent arcing.

Zytel's Electrical and Flammability Properties Depend on the Purity of its Additives

28.     The particular flame-retardant additive used by Zytel is known as a halogenated styrene, the production of which forms free ionic contaminants as byproducts.  Free ionic contaminants are typically acids or salts which can disassociate into either positively or negatively charged species and increase the overall conductivity of the host material.  The presence of excessive ions within a material, known as ionic contamination, can render it unsuitable for use as an insulator.

29.     As the concentration of ions within a nylon such as Zytel increases, its electrical resistivity decreases.  Thus, to maintain the electrical insulation properties of a plastic using a

halogenated styrene, the additive must be thoroughly washed and neutralized to prevent ionic

contamination.  Furthermore, as nylon absorbs moisture, any present free ions become

increasingly mobile, causing a further reduction in electrical resistivity.

A Series of Bad Batches of Zytel Were the Cause of the Dryer Fires

30.     In the production of Zytel, DuPont combined nylon 66 polymer with a glass-fiber-

based, flame-retardant additive which it purchased from third-party suppliers.  In July 2010,

DuPont began purchasing this additive from a different supplier ("Supplier A").  Unbeknownst

to Arcelik, the electrical resistivity of Zytel that DuPont produced with Supplier A's additive

substantially dropped to a fraction of the resistivity of the Zytel DuPont had produced when

using additive provided by other suppliers.

31.     The drop in electrical resistivity of Zytel produced with Supplier A's additive was

even more significant in humid conditions.  In the months after July 2010, the electrical

resistivity of Zytel in humid conditions dropped from 10,000 megohms to as little as 5

megohms[1]—creating a risk of failure, even for low voltage applications such as the capacitors

used in Arcelik's tumble dyers.

32.     In early August 2012, several months before Arcelik received the first reports of

dryer fires, DuPont began to receive customer complaints that molded parts made with Zytel

were displaying lower electrical resistivity than normal.  Lower resistivity means an increased

chance of the Zytel conducting electricity – rather than performing its designed function as an

insulator – and thus an increased risk of electrical arcing and resulting fires.

33.     Upon receiving those reports, DuPont ceased using flame retardant material from

Supplier A in the production of Zytel.  Shortly thereafter, DuPont isolated all Zytel lots

---

[1] One megohm equals 1 million ohms, or 10^6 ohms.

containing flame retardant from Supplier A, removing them from the sales channel. At this time – still months before Arcelik received the first report of dryer fires from its customers – DuPont did not share these reports with Arcelik or the public or otherwise take steps to warn Zytel end users of the risks associated with using these bad batches of Zytel.

34.     DuPont concluded its internal investigation into the cause of the faulty batches of Zytel on September 8, 2012, finding that the sudden decrease in Zytel's electric resistivity was caused by abnormally high ionic concentration in flame retardant material received from Supplier A. The Zytel produced during this period did not conform to the volume resistivity information provided in various product data forms, and did not conform with DuPont's repeated representations that Zytel was suitable for use within electrical appliances.

35.     In late October 2012 – nearly two months after it concluded its internal investigation – DuPont issued a notice stating that "levels of ionic species now appear to have been elevated" in certain lots of Zytel, causing "incidents . . . under conditions of high humidity and temperature." This notice did not include a warning that the faulty Zytel could cause fires; in fact, DuPont claimed in the notice that Zytel's "flammability rating and mechanical properties were not affected."

36.     DuPont, however, eventually admitted that the bad batches of Zytel could cause fires, although it did not do so until February 2013 – nearly four months after it had issued its October 2012 notice. In February 2013, DuPont issued a notice warning of the propensity of the flawed batches of Zytel to cause fires.

37.     At the time the bad batches of Zytel were produced, DuPont had no internal quality assurance procedures to test for ionic contamination, nor did it have any procedures in place to test Zytel for its electrical resistivity.

Arcelik Investigation

38.     Arcelik conducted its own investigation to determine the cause of the fires. Consistent with DuPont's findings, Arcelik's investigators found that certain batches of Zytel used on the Epcos capacitors contained an excessive amount of ionic concentration, and concluded that this contamination was the root cause of the fires.  Specifically, the investigators concluded that the abnormal levels of ions in the affected Zytel degraded its electrical properties to such an extent that the Zytel failed to insulate the terminal lugs in the capacitors, causing electrical fires.

DuPont Had Made Representations that Zytel Was Suitable for Use in Arcelik's Dryers

39.     It is well known within the electrical-appliance-manufacturing industry (as well as within DuPont) that Zytel polymers are widely used in applications where a combination of strict, consistent electrical resistivity properties is required, such as in electric tumble dryers.

40.     During the period leading up to Arcelik's decision to use capacitors containing Zytel, DuPont widely marketed Zytel as having properties (including heat and humidity resistance) that made it suitable for use in Arcelik's dryers.

41.     For example, in a March 2003 publication entitled *DuPont – Zytel® Product Guide and Properties*, DuPont represented that Zytel possessed electrical resistivity of 10,000 megohms under humid conditions—which would have made it suitable for use in Arcelik's dryers had it been true for all batches.

42.     In a June 2001 publication entitled *DuPont- Minlon® and Zytel® Design Information – Module II*, DuPont represented that Zytel was "generally used in electrical applications requiring 600 volts or less" (such as the dryer capacitors), and that "ZYTEL® nylon resins are resistant to hot water and steam. Thus, ZYTEL® has found wide uses in such

applications as hot water mixing valves, gears and baskets, equipment used for conveying in hot water and parts which must be subjected to steam."

43.     On DuPont's website, on a page entitled *Electrical & Electronic Plastics*, DuPont stated that Zytel was "tough, light and resilient in hot, chemically aggressive and humid environments, making it an excellent choice for an electrical plastic."

44.     Elsewhere online, DuPont indicated that Zytel had "[e]xcellent insulating/electrical resistance," and that it was tested for "heat, humidity and chemical resistance."

45.     DuPont issued a press release specifically highlighting the use of Zytel in "small household appliances" including "washing machines and dishwashers."  In this same publication, DuPont explained that "[c]haracteristics that Zytel® offers to electrical component designs and requirements include an inherent UL94-V2 flame rating @ 0.4mm, and high arc ignition resistance of HAI = PLC0,[2] CTI > 600 V[3] to prevent fire hazards that can be caused by conductor arcing."

46.     In DuPont's online *Material Data Center*, it provided documents noting that "Zytel® nylon resin typically is used in demanding applications in the automotive, furniture, domestic appliances, sporting goods and construction industry."

47.     In a publication entitled *Zytel/Minlon: Design Guide-Module II*, DuPont stated that "Zytel nylon resins are widely used in electromechanical parts because of their excellent mechanical properties, chemical resistance, heat resistance and satisfactory electrical properties."

---

[2] High arc ignition resistance ("HAI") indicates the number of seconds that a material resists ignition when subjected to a high voltage low current arcing source.  Although HAI is measured in seconds, it may be expressed by means of its UL Performance Level Category ("PLC"), from 3 (worst) to 0 (best).

[3] Comparative Tracking Index ("CTI") is used to measure the electrical breakdown ("tracking") properties of an insulating material and is used for electrical safety assessment of electrical apparatuses. A CTI of >600V is considered to represent the highest level of performance.

The same publication noted that Zytel had "electrical properties adequate for most power frequencies and voltages."

48.     In a document entitled *DuPont Zytel: Product Guide and Properties*, DuPont stated that "[t]he key features of ZYTEL® nylons are . . . good electrical and flammability properties."

49.     DuPont made various similar statements through various channels, including that "[m]ajor use" of Zytel® is "[f]or electrical connectors;" Zytel is "the choice for a wide variety of electrical applications;" and Zytel has "properties most commonly used by designers in selecting material for electrical applications."

50.     DuPont also provided a specification sheet for Zytel, written in 2007, which listed a number of characteristics with respect to its mechanical, electrical, and flammability qualities. This specification sheet included characteristics conveying suitability in electrical applications, including that Zytel had a UL Product Level Category of: (a) 2 for its Comparative Tracking Index;[4] (b) 1 for its High Voltage Arc Tracking Rate;[5] and (c) 0 for its High Current Arc Tracking Rate.[6]  These rating all indicated the suitability of Zytel for use as an insulator for low voltage applications such as tumble dryers.

51.     Furthermore, additional DuPont representations about Zytel, which were untrue with respect to the bad batch that caused Arcelik's dryers to catch fire, were communicated by publications of the Underwriters Laboratories LLC ("UL").  UL is an independent safety science

---

[4]Although CTI is measured in volts, it is often expressed by its PLC.  The categories range from 5 (worst) to 0 (best).

[5] High Voltage Arc Tracking Rate ("HVTR") is a test method used to assess the susceptibility to tracking of insulating materials that are exposed to high voltages outdoors.  While usually expressed in millimeters/min, the HVTR may also be expressed by its PLC, ranging from 4 (worst) to 0 (best).

[6] Similar to HVTR, High Current Arc Tracking Rate measures an insulating material's susceptibility to tracking while exposed to high currents.

company offering certification and testing services, as well as developing internationally-recognized product and testing standards for a variety of products.

52.     UL certifies polymer plastics for compliance to global standards "intended to mitigate the risks of fire, electric shock, personal injury, and environmental hazards." UL certifies a plastic product's characteristics by issuing a data sheet known as a "Yellow Card," which the producer can show to potential direct-purchasers, end-users, and other interested parties. Yellow Cards bear information relative to specific polymeric materials which a company has submitted to UL, and they are widely relied upon by industry participants to determine whether a polymer plastic is suitable for a particular application.

53.     For at least 15 years prior to 2012, UL issued Yellow Cards certifying that Zytel possessed certain characteristics relating to strength, flammability, electrical properties, and other categories. The Yellow Card for Zytel, issued from 1996 to 2012, contained information about various electrical characteristics of Zytel indicating it was sufficient for use as an insulator in low-to-medium voltage electrical applications, including the rated voltage for the capacitors used by Arcelik. Of particular relevance to Arcelik's application, the Yellow Card reflected that Zytel had: (i) a flame retardancy class of V-0 down to 0.35mm thickness;[7] (ii) an electric relative temperature index of 130;[8] (iii) a comparative tracking index of 2; (iv) a high voltage tracking resistance of 1; (v) a dielectric strength of 25 kV/mm;[9] and (vi) volume electrical resistivity of 10,000 megohms.

---

[7] Rating "V-0" is the highest rating for flame retardancy.

[8] Relative temperature index denotes the maximum service temperature (in degrees Celsius) for a material where specific properties are not unacceptably compromised.

[9] Dielectric strength is defined as the maximum voltage required to produce a dielectric breakdown through the material and is expressed as volts per unit thickness. 25kV equals 25,000 V.

54.     The Yellow Card for Zytel states that "[t]he information presented on this data sheet was acquired by UL IDES from the producer of the material," *i.e.*, DuPont.

55.     DuPont disseminated the information on Zytel's UL Yellow Card relating to Zytel's electrical resistivity to its customers for their consideration of whether Zytel was suitable for their purposes.  On its website and through its product guides, DuPont encouraged customers to "[s]ee [Zytel's] UL 'Yellow Card,' available from your DuPont sales office, for complete information."

56.     In short, DuPont made numerous, repeated representations that reflected Zytel's suitability for use in home appliances such as dryers that require that the insulation material perform under conditions of high heat and humidity.  Those with expertise in the electrical-appliance-manufacturing industry would understand DuPont's representations about Zytel (including those set forth above) to convey, both individually and collectively, that Zytel was appropriate for use in the capacitors incorporated into Arcelik's tumble dryers.

57.     Arcelik relied on DuPont representations in selecting a capacitor that used Zytel to incorporate into its dryers.  Indeed, DuPont actively encouraged such reliance by touting its quality controls and thoroughness of its research and development efforts.  For example, on its webpage entitled *Electrical and Electronic Plastics*, DuPont stated: "Applications such as electrical and electronic housings, enclosures, sockets, switches and wiring components can leverage the strong and extensive research and development efforts that DuPont has committed to its DuPont™ Zytel . . . engineering polymers."

DuPont Lacked Any Basis for These Representations

58.     The ionic contamination of the defective Zytel severely degraded its electrical properties and foreclosed its suitability for use in even low-voltage electrical applications,

especially in hot and humid conditions where mobility of the free ions was increased.  Thus, each of DuPont's aforementioned representations as to the qualities and characteristics of Zytel was false with respect to the defective batches of the material.

59.     At all times relevant to this lawsuit, DuPont did not test, sample, or take any other action to determine whether the Zytel it was producing complied with the representations made by DuPont about its qualities and characteristics.

Arcelik's Resulting Injuries

60.     Arcelik sold dryers manufactured with the contaminated Zytel.  It subsequently received notice that many of these dryers were catching fire.  These fires caused property damage and presented a serious safety hazard for hundreds of Arcelik's customers.

61.     Arcelik incurred substantial out-of-pocket expense in remedying the situation, which included initiating a voluntary recall of affected dryers and compensating customers for various other property damage caused by the dryer fires.  Arcelik suffered various other injuries as well, including without limitation injury to its reputation as a result of dryer fires being associated with its brand.

**CLAIM ONE**
**NEGLIGENT MISREPRESENTATION**

62.     Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

63.     DuPont's misrepresentations about Zytel were made by DuPont in the course of its commercial business, in which it has a pecuniary interest—namely, for the purpose of inducing its direct purchasers, end-users, and other industry participants, including Arcelik, to purchase Zytel and components that incorporate Zytel for use in various electrical applications, including tumble dryers.

64.     DuPont is in the business of supplying information, including to promote products that it sells, including Zytel.

65.     DuPont supplied the information to its direct purchasers, end-users, and other industry participants, including Arcelik, specifically to provide them guidance in their manufacturing decisions and business transactions with DuPont and with third parties.

66.     Arcelik is one of a limited group of persons – *i.e.*, end-users of Zytel – for whose benefit and guidance DuPont intended to supply the information.   DuPont's representations about Zytel were not written for the public at large; rather, they were written specifically for engineers, product design experts, and other knowledgeable industry participants considering the suitability of Zytel in various manufacturing applications, such as incorporation into capacitors used in Arcelik's dryers.

67.     DuPont's misrepresentations were the foreseeable cause of the dryer fires. Arcelik selected Zytel for use in its electrical dryers in reliance on these representations.  The defective Zytel did not possess the electrical characteristics that DuPont represented, leading to the electrical fires.

68.     Arcelik was aware of DuPont representations about Zytel and relied on them in determining whether to use electrical components containing Zytel in their manufacturing process.  Arcelik's reliance was justifiable and reasonable, including because it reasonably believed DuPont had some process to mitigate the risk of ionic contamination, DuPont had superior knowledge about Zytel's characteristics, DuPont represented that its word could be trusted in light of its experience and quality control procedures, and certain of the DuPont representations were conveyed via UL, whose certifications are globally recognized.

69.     Arcelik's losses resulted from a transaction of the kind that DuPont intended its statements to influence—specifically, the selection and purchase of components containing Zytel, based on Zytel's perceived electrical characteristics.

70.     DuPont failed to exercise reasonable care or competence in obtaining and communicating the information because it had no process for measuring, and did not measure, Zytel's electrical resistivity, and therefore had no basis for believing that Zytel's reported electrical properties were accurately reflected by, or would remain consistent with, published data.  It was further unreasonable for DuPont to make these statements when it took no steps to detect or prevent ionic contamination of Zytel, which DuPont knew would severely denigrate Zytel's electrical characteristics, especially under humid conditions.

71.     The dryer fires, and Arcelik's resulting injuries, were directly and proximately caused by faulty Zytel that did not comply with representations that DuPont had made about the product.

## CLAIM TWO
## FRAUDULENT MISREPRESENTATION

72.     Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

73.     DuPont purposefully directed its misrepresentations of fact about Zytel to its direct purchasers, end users, and other industry participants, including Arcelik, for the purpose of inducing them to purchase Zytel for use in various applications, including electrical appliances such as dryers.

74.     The representations and/or omissions about Zytel's electrical characteristics and suitability for use in electric applications were false and misleading with respect to the defective batches of Zytel.

75.     DuPont's misrepresentations about Zytel were made with a reckless disregard for the truth.  DuPont knew that it lacked any basis for these representations because it did not measure the electrical resistivity of the Zytel it produced and did nothing to measure or to detect or mitigate the risk of ionic contamination of Zytel, which it knew would severely degrade the product's electrical and flammability characteristics and suitability for use in electrical appliances.

76.     DuPont also knew that the specific flame-retardant material used in Zytel produced free ions as byproduct.  DuPont further knew that the effects of ionic contamination would be amplified within humid environments, and that Zytel, as a nylon polymer, as particularly prone to absorb moisture.

77.     These misrepresentations were material; electrical characteristics are of paramount importance in selecting the components of electric appliances.  The use of insufficiently resistant material creates a high likelihood of electrical arc fires, which may cause property damage and injury.

78.     Arcelik was aware of DuPont representations about Zytel and relied on them in determining whether to use electrical components containing Zytel in their manufacturing process.  Arcelik's reliance was justifiable and reasonable, including because it reasonably believed DuPont had some process to mitigate the risk of ionic contamination, DuPont had superior knowledge about Zytel's characteristics, DuPont represented that its word could be trusted in light of its experience and quality control procedures, and certain of the DuPont representations were conveyed via UL, whose certifications are globally recognized.

79.     The dryer fires, and Arcelik's resulting injuries, were directly and proximately caused by faulty Zytel that did not comply with representations that DuPont had made about the product.

**CLAIM THREE**
**BREACH OF IMPLIED WARRANTY: FITNESS FOR PARTICULAR PURPOSE**
**(DEL. CODE ANN. tit. 6, § 2-318)**

80.     Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

81.     DuPont knew, or had reason to know, as shown by its numerous representations about Zytel, that the product was required for the particular purpose of use in electrical applications, including low-voltage household appliances such as tumble dryers.

82.     DuPont further knew, or had reason to know, as shown by its numerous representations about Zytel, that the product was required for use in hot and humid environments.

83.     Arcelik, as an end-user appliance manufacturer, was reasonably expected to use, consume, or be affected by Zytel.

84.     DuPont further knew that Arcelik and other end-user manufacturers relied on DuPont's superior knowledge, skill, and judgment as to plastic polymers to select or furnish suitable goods that would fit the particular purpose to which Arcelik put Zytel.

85.     DuPont's numerous, repeated representations about Zytel's fitness for use in electrical applications constituted an implied warranty that the product was suitable and proper for this purpose.

86.     Zytel was, in fact, markedly unfit for use in this purpose because it was contaminated by ionic content, severely degrading its capabilities as an electrical insulator, which ultimately led to the electrical fires.

87.     Arcelik notified DuPont of the product's failure within a reasonable time after its discovery.

88.     The dryer fires, and Arcelik's resulting injuries, were directly and proximately caused by faulty Zytel that did not comply with representations that DuPont had made about the product.

**CLAIM FOUR**
**VIOLATION OF DELAWARE CONSUMER FRAUD ACT**
**(DEL. CODE ANN. Tit. 6, §§ 2511 – 2527)**

89.     Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

90.     DuPont's marketing materials, advertisements, product guides, and other materials misrepresented the electrical characteristics of Zytel with the intent that its customers, end-users, and others would rely upon those representations in connection with the sale of Zytel.

91.     DuPont made these representations to induce, directly or indirectly, end users such as Arcelik to utilize components made from Zytel.

92.     DuPont also concealed or omitted material facts, including the fact that it had no process for measuring the electrical-resistivity characteristics or detecting ionic contamination of Zytel, with the intent that its customers, end-users, and others would rely upon such concealment or omission in connection with the sale of Zytel.

93.     DuPont authored, published, and disseminated these misrepresentations from the state of Delaware.

94.     The dryer fires, and Arcelik's resulting injuries, were directly and proximately caused by faulty Zytel that did not comply with representations that DuPont had made about the product.

**CLAIM FIVE**
**NEGLIGENT MANUFACTURE OF A DEFECTIVE PRODUCT**

95.     Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

96.     DuPont is engaged in the business of manufacturing, selling, or otherwise distributing Zytel.

97.     DuPont owes a duty to the public and to any users of the product to exercise reasonable care, skill, and diligence in the manufacture of Zytel, especially in light of the serious harm likely to result from its defectiveness in electrical applications.

98.     DuPont failed to exercise reasonable care in manufacturing Zytel such that the product contained a manufacturing defect when placed into the stream of commerce.

99.     The Zytel was defective at the time of sale because it contained an additive that was contaminated with ionic material, which severely degraded Zytel's electrical characteristics.

100.     Specifically, DuPont did not exercise reasonable care when manufacturing Zytel because it did nothing to detect or mitigate the risk of ionic contamination, despite its knowledge that, because of the nature of the flame-retardant additive, such contamination was likely to occur and would severely degrade the product's electrical and flammability characteristics and suitability for use in electrical appliances.

101.     DuPont also knew that the specific flame-retardant material used in Zytel produced free ions as byproducts, that the effects of ionic contamination would be amplified

within humid environments, and that Zytel, as a nylon polymer, was particularly prone to absorb moisture.

102.    The dryer fires, and Arcelik's resulting injuries, were directly and proximately caused by the defective Zytel.  No other component of the tumble dryers was defective in and of itself.

## CLAIM SIX
## TORTIOUS INTERFERENCE WITH A CONTRACT

103.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

104.    On August 31, 2009, Arcelik entered into a contract with Epcos for the purchase of capacitors to be used in its line of electric dryers.  Following an extension by mutual agreement on October 3, 2011, the term of the contract ended on December 31, 2012.

105.    The contract required Epcos to supply capacitors possessing certain specifications related to their electrical capabilities, including the capability of performing at their rated level of voltage, in hot and humid conditions.

106.    Based on information and belief, DuPont, its subsidiaries, and/or its agents were aware of this contract.

107.    DuPont, through its misrepresentations about Zytel's electrical capabilities and its sale of defective Zytel, caused Epcos not to perform its contractual obligations.  Specifically, Epcos selected Zytel in reliance on its represented characteristics, and the capacitors caught fire as a result of the defective Zytel.

108.    Furthermore, DuPont knew that the interference was certain or substantially certain to occur as a result of its repeated representations about Zytel, coupled with its lack of any basis to make those representations.

109.     DuPont's interference with the contract between Arcelik and Epcos caused Arcelik's injuries.

110.     DuPont had no legitimate adverse business interest or other justification for interfering with the contract.

## REQUESTED RELIEF

111.     Based on the preceding allegations and claims, Plaintiff respectfully requests:

A.     That the Court award Plaintiff compensatory damages against Defendant for its violations of law, in an amount to be determined by this Court, plus interest;

B.     That the Court award Plaintiff its costs of suit, including reasonable attorneys' fees and expenses;

C.     That the Court direct such further relief as it may deem just and proper.

Dated: October 22, 2015

Respectfully submitted,

OF COUNSEL:

Jonathan L. Greenblatt
Keith R. Palfin
SHEARMAN & STERLING LLP
801 Pennsylvania Ave. NW, Suite 900
Washington, D.C.  20004
Telephone: (202) 508-8000
Facsimile: (202) 508-8100
jgreenblatt@shearman.com
kpalfin@shearman.com

 /s/ Kevin G. Abrams
Kevin G. Abrams (#2375)
John M. Seaman (#3868)
ABRAMS & BAYLISS LLP
20 Montchanin Road, Suite 200
Wilmington, DE  19807
Telephone: (302) 778-1000
Facsimile: (302) 778-1001
abrams@abramsbayliss.com
seaman@abramsbayliss.com