**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ARÇELIK, A.Ş. | |
| Plaintiff, | |
| v. | C. A. No. 15-961-LPS |
| E. I. DU PONT DE NEMOURS AND COMPANY, | |
| Defendant. | **JURY TRIAL DEMANDED** |

## AMENDED COMPLAINT

1.      Plaintiff Arçelik, A.Ş. ("Arcelik"), a major consumer appliance manufacturer,
brings this lawsuit against Defendant E.I. DuPont de Nemours and Company ("DuPont") for
damages Arcelik suffered as a result of a faulty DuPont product that was a key component in
clothing dryers made and sold by Arcelik to the public.  A number of these dryers caught fire
when being used by Arcelik's customers as a result of the defects in DuPont's product.  After
learning of the fires, Arcelik initiated a costly recall of the affected dryers and compensated its
customers for fire damage they had suffered.  Despite the fact that DuPont has itself concluded
that its product was defective, DuPont has refused to compensate Arcelik for damages it suffered
as a result of DuPont's manufacturing and quality control failures.

### NATURE OF THE ACTION

2.      Arcelik manufactured electric tumble dryers that utilized capacitors that contained
Zytel—a plastic resin manufactured, marketed, and sold by DuPont.  Arcelik selected these
components in reliance on DuPont's representations that Zytel had various characteristics,
including the ability to operate under conditions of high heat and humidity, which made it
suitable for use in electrical components incorporated into Arcelik's dryers.

3.      In late 2012, those tumble dryers began catching fire in the homes of Arcelik customers, damaging property, risking personal injury, and subjecting Arcelik to significant remediation expenses.  Multiple investigations determined that the electrical fires were caused by a series of defective batches of Zytel which were contaminated in a way that degraded its electrical insulation capabilities under conditions of high heat and humidity.

4.      The ability of Zytel to insulate electricity under such conditions was a feature heavily touted by DuPont, in various different ways, in its promotion of the product.  It was also a critical feature for Arcelik: it was these capabilities that made Zytel appropriate for use in Arcelik's dryers.  The problems with the bad batches of Zytel sold by DuPont made the product a fire hazard.

5.      Various DuPont representations regarding Zytel were false with respect to these defective batches.  For example, DuPont made repeated representations that Zytel was suitable for use in low-voltage electric applications, including in hot and humid environments, and made representations as to the particular electrical properties of Zytel, which—had they been true— would have rendered Zytel suitable for Arcelik's use.  Those representations were not true with respect to the bad batches of Zytel produced by DuPont.

6.      Moreover, these DuPont representations were made with a reckless disregard for the truth: Despite DuPont's repeated representations indicating that Zytel was suitable for the use to which Arcelik put it, DuPont in fact had *no process whatsoever* for testing the electrical resistivity of Zytel, or for detecting catastrophic defects such as occurred here.  DuPont simply had no way of knowing whether representations it was making about the electrical insulation capabilities of its product were true with respect to any particular batch of Zytel.

7.      Arcelik reasonably trusted DuPont's word about Zytel's characteristics, as DuPont encouraged end users like Arcelik to do in touting its purportedly world-class testing and quality control processes.  DuPont made a series of bad batches of Zytel that did not have the qualities promised by DuPont.  Had the Zytel had those promised qualities, Arcelik's dryers would not have caught on fire.  DuPont should be held responsible for Arcelik's losses.

## PARTIES

8.      Plaintiff Arçelik A.S. is a household-appliance manufacturing company with its principal place of business at Karaağaç Caddesi No: 2-6, Sütlüce 34445, İstanbul, Turkey.

9.      Defendant E. I. du Pont de Nemours and Company is a Delaware corporation with its principal place of business at 1007 Market Street, Wilmington, Delaware 19898.

## JURISDICTION AND VENUE

10.      Jurisdiction of all claims is appropriate in the United States District Court for the District of Delaware pursuant to 28 U.S.C. § 1332 because there is diversity of citizenship between Plaintiff and Defendant and the amount in controversy exceeds $75,000, exclusive of interest and costs.

11.      Venue as to all claims is appropriate in the United States District Court for the District of Delaware pursuant to 28 U.S.C. § 1391(b)(1) because Defendant resides in this district.  Venue is also appropriate under 28 U.S.C. § 1391(b)(2) because DuPont maintains its principal place of business in Delaware, at which place it engaged in research, design, production, marketing, and sales operations relating to Zytel.  Alternatively, venue is appropriate under 28 U.S.C. § 1391(b)(3) because this Court has personal jurisdiction over Defendant.

## FACTS

Arcelik and the Dryer Fires

12.     Founded in 1955, Arcelik manufactures and sells household appliances under multiple brands in over 100 countries.  One of Arcelik's product lines includes electric tumble dryers.  At all times relevant to this Complaint, Arcelik was engaged in the manufacturing and selling of Arcelik tumble dryers.

13.     In late 2012 and early 2013, Arcelik received reports that certain of its dryers were catching fire, causing property damage and presenting a serious safety hazard for hundreds of Arcelik customers.  The homes of a number of Arcelik customers were destroyed or damaged after their dryer burst into flames.

14.     In response to these reports, Arcelik issued a safety notice to its customers who had purchased affected dryers regarding a potential fire risk.  To minimize risk of further property damage and personal injury, Arcelik also implemented a voluntary recall process in European countries, including the United Kingdom and France, undertaking to replace and/or repair all affected dryers.  Arcelik also compensated customers for damage to property caused by the dryer fires.

The Dryer Capacitors

15.     Arcelik tumble dryers are household appliances that circulate heated air through a rotating drum to remove moisture from clothing.  These dryers utilize an electric motor which drives the rotating drum ("tumbler") and fan components.

16.     Electric capacitors are energy storing devices, whose purpose is to regulate and maintain the flow of electrical current to electric motors.  Capacitors store an electrical charge on two conductive plates separated by an insulating layer within the cylindrical case, and connect to

a circuit by way of two "terminal lugs" protruding from one end.  Arcelik purchased the capacitors used in the dryers at issue in this case from a German manufacturer, Epcos AG ("Epcos").

17.     The capacitors supplied by Epcos incorporated a plastic product known as Zytel, which was developed, manufactured, and marketed by DuPont and sold by DuPont, including through its global subsidiaries, such as E.I. Du Pont India Private Ltd. ("DuPont India") and E.I. DuPont China Holding Co. Ltd. ("DuPont China"), which acted under the direction and control of DuPont and were agents of DuPont at all relevant times.

18.     Epcos purchased the Zytel at issue from DuPont India.  DuPont India is one of many DuPont subsidiaries worldwide that sell Zytel and other DuPont products under the direction and control of DuPont.  DuPont India acted as a sales agent for DuPont at all relevant times.

19.     Zytel is manufactured at various different DuPont manufacturing sites.  Zytel is a DuPont product, manufactured under the direction and control of DuPont, which is intended to have the same specifications and characteristics regardless of which DuPont plant manufactured it.  Therefore, DuPont does not normally identify which batches of Zytel were produced at which site.  Some or all of the DuPont plants that manufacture Zytel are owned in the name of DuPont subsidiaries.  DuPont has represented in submissions made to this Court that the Zytel at issue in this case had been manufactured by DuPont China.  (Declaration of Richard Mayo, D.I. 7-1 ¶ 5.)  This fact was not known to Arcelik until DuPont disclosed it in this case.  Further, upon information and belief, every publicly available piece of information about Zytel published by DuPont identifies Zytel only as a "DuPont" product and does not distinguish Zytel by the plant, division, and/or subsidiary that manufactured it.

20.    Epcos used Zytel to mold exterior components of its capacitors.  Specifically, Zytel served as the material forming the "top disc" of the capacitor, the purpose of which is to electrically isolate the terminal lugs from each other and from the main aluminum case carrying the electrical charge.

21.    The plastic top disc seals the body of the capacitor case from the terminal lugs and also includes a "shield" that separates the terminals lug from each other, as the following illustration reflects:



"Top disc" sealing body of capacitor case from terminal lugs

"Shield" separating terminal lugs

22.    A key purpose of this design is to avoid arc fires.  Arc fires can occur when the insulating material breaks down, allowing electrical current to jump the gap between the two terminals, creating an intensely hot, flammable discharge.

23.    In 2006, VDE Testing and Certification Institute (a leading European product-safety institute) issued a safety certification for Epcos capacitors, indicating their suitability for use in Arcelik dryers.  This certification included a material test report identifying Zytel as the top-disc material in the capacitors.

Zytel and Importance of Electrical Resistivity

24.    Zytel is a polyamide plastic resin intended for injection molding within various manufacturing applications.  It is one species of a large class of plastics derived from Nylon 66, which is one of the most widely-used engineering polymers.  The applications of Nylon 66, and Nylon 66 derivatives such as Zytel, can be extended by the incorporation of various filler

materials, or additives, which can serve to modify attributes such as strength, wear resistance, chemical resistance, and flammability.

25.     Zytel is a Nylon 66 blend modified by the addition of 25% glass fibers for the purpose of increasing the plastic's flame resistance.  As such, Zytel is particularly marketed by DuPont for its flame retardant characteristics.  Indeed, in light of its flame resistance, Zytel is well-known and commonly used in the mechanical support of live contacts in electrical appliances where there needs to be insulation against electrical conductivity.

26.     In determining whether a plastic is suitable for electric use, engineers consider a variety of characteristics, including the product's surface and volume resistivity, comparative tracking index ("CTI"), High Voltage Arc Tracking Rate, as well as other thermal and structural qualities.

27.     Electrical resistivity is an intrinsic property that quantifies how strongly a given material opposes the flow of electric current.  Resistivity is the reciprocal measure of a material's conductivity; thus, a low resistivity indicates a material that is conducive to electric current and unsuitable for use in electrical settings that require insulation of electricity.  Resistivity may be measured in terms of both surface resistivity (*e.g.*, the surface of the capacitor's top disc supporting the terminals) and volume resistivity (*e.g.*, the plastic shield positioned between the two terminals of the capacitor).

28.     As explained in a DuPont Technical Report: "High volume resistivity guarantees that the material acts as an insulator. The volume resistivity test is often used in checking the uniformity of an insulating material, either to determine the uniformity of processing or to detect traces of impurities which affect the quality of the material and which may not be readily detected by other means.  It is also used to determine the effect of moisture on a material."

29.     In household electric appliances, sufficient surface and volume resistivity of the plastic components (based on the voltage rating of the appliance) is crucial to ensure electrical currents between the terminals will not travel across or through the insulating material, which can result in an arc-fire.  With regard to the particular capacitors supplied to Arcelik, the electrical characteristics of the polymer must be sufficient to insulate a certain level of current between the terminals, and to provide a certain level of insulation between the case and the terminals to prevent arcing.

Zytel's Electrical and Flammability Properties Depend on the Purity of its Additives

30.     The particular flame-retardant additive used by Zytel is known as a halogenated styrene, the production of which forms free ionic contaminants as byproducts.  Free ionic contaminants are typically acids or salts which can disassociate into either positively or negatively charged species and increase the overall conductivity of the host material.  The presence of excessive ions within a material, known as ionic contamination, can render it unsuitable for use as an insulator.

31.     As the concentration of ions within a nylon such as Zytel increases, its electrical resistivity decreases.  Thus, to maintain the electrical insulation properties of a plastic using a halogenated styrene, the additive must be thoroughly washed and neutralized to prevent ionic contamination.  Furthermore, as nylon absorbs moisture, any present free ions become increasingly mobile, causing a further reduction in electrical resistivity.

A Series of Bad Batches of Zytel Were the Cause of the Dryer Fires

32.     In the production of Zytel, DuPont combined nylon 66 polymer with a glass-fiber-based, flame-retardant additive which it purchased from third-party suppliers.  In July 2010, DuPont began purchasing this additive from a different supplier ("Supplier A").  Unbeknownst

to Arcelik, the electrical resistivity of Zytel that DuPont produced with Supplier A's additive substantially dropped to a fraction of the resistivity of the Zytel DuPont had produced when using additive provided by other suppliers.

33.     The drop in electrical resistivity of Zytel produced with Supplier A's additive was even more significant in humid conditions.  In the months after July 2010, the electrical resistivity of Zytel in humid conditions dropped from 10,000 megohms to as little as 5 megohms[1]—creating a risk of failure, even for low voltage applications such as the capacitors used in Arcelik's tumble dyers.

34.     In early August 2012, several months before Arcelik received the first reports of dryer fires, DuPont began to receive customer complaints that molded parts made with Zytel were displaying lower electrical resistivity than normal.  Lower resistivity means an increased chance of the Zytel conducting electricity – rather than performing its designed function as an insulator – and thus an increased risk of electrical arcing and resulting fires.

35.     Upon receiving those reports, DuPont ceased using flame retardant material from Supplier A in the production of Zytel.  Shortly thereafter, DuPont isolated all Zytel lots containing flame retardant from Supplier A, removing them from the sales channel.  At this time – still months before Arcelik received the first report of dryer fires from its customers – DuPont did not share these reports with Arcelik or the public or otherwise take steps to warn Zytel end users of the risks associated with using these bad batches of Zytel.

36.     DuPont concluded its internal investigation into the cause of the faulty batches of Zytel on September 8, 2012, finding that the sudden decrease in Zytel's electric resistivity was caused by abnormally high ionic concentration in flame retardant material received from

---

[1] One megohm equals 1 million ohms, or 10^6 ohms.

Supplier A.  The Zytel produced during this period did not conform to the volume resistivity

information provided in various product data forms, and did not conform with DuPont's repeated

representations that Zytel was suitable for use within electrical appliances.

37.     Based on information and belief, this internal investigation was conducted from

the United States by DuPont.  The September 8, 2012 investigation report contained markings

identifying it only as a "DuPont" report throughout, and did not contain any reference to the

DuPont subsidiaries to which DuPont had delegated manufacturing and sales responsibilities for

the DuPont Zytel at issue.  The DuPont report further stated that "[c]orrective actions . . .

[would] be tracked through DuPont corrective action system," and that DuPont would "[u]pdate

[the] status for implementation at each affected DuPont manufacturing site across the globe."

38.     In late October 2012 – nearly two months after it concluded its internal

investigation – DuPont issued a notice to customers who had purchased faulty Zytel.  This letter

was sent on the letterhead of "DuPont Performance Polymers," and provided a U.S. return

address.  DuPont Performance Polymers is a division of DuPont.  The notice was signed by

David J. Donofrio, identified as "Global Product Manager, Structural for DuPont Zytel, Crastin,

Zytel HTN, and Rynite."  Mr. Donofrio was an employee of DuPont; he was not an employee of

DuPont India, DuPont China, or any of the other DuPont subsidiaries to which DuPont had

delegated manufacturing and sales responsibilities for Zytel.  The notice was sent by DuPont to

all purchasers of the faulty Zytel, regardless of which DuPont division or subsidiary had made

the sale.

39.     The October 2012 notice stated that "levels of ionic species now appear to have

been elevated" in certain lots of Zytel, causing "incidents . . . under conditions of high humidity

and temperature."  This notice did not include a warning that the faulty Zytel could cause fires;

in fact, DuPont claimed in the notice that Zytel's "flammability rating and mechanical properties were not affected."

40.     DuPont, however, eventually admitted that the bad batches of Zytel could cause fires, although it did not do so until February 2013 – nearly four months after it had issued its October 2012 notice.  In February 2013, DuPont issued a notice warning of the propensity of the flawed batches of Zytel to cause fires.  Upon information and belief, the February 2013 notice – like the October 2012 notice – was sent by DuPont, not by any of its subsidiaries.

41.     At the time the bad batches of Zytel were produced, DuPont had no internal quality assurance procedures to test for ionic contamination, nor did it have any procedures in place to test Zytel for its electrical resistivity.

Arcelik Investigation

42.     Arcelik conducted its own investigation to determine the cause of the fires. Consistent with DuPont's findings, Arcelik's investigators found that certain batches of Zytel used on the Epcos capacitors contained an excessive amount of ionic concentration, and concluded that this contamination was the root cause of the fires.  Specifically, the investigators concluded that the abnormal levels of ions in the affected Zytel degraded its electrical properties to such an extent that the Zytel failed to insulate the terminal lugs in the capacitors, causing electrical fires.

DuPont Had Made Representations that Zytel Was Suitable for Use in Arcelik's Dryers

43.     It is well known within the electrical-appliance-manufacturing industry (as well as within DuPont) that Zytel polymers are widely used in applications where a combination of strict, consistent electrical resistivity properties is required, such as in electric tumble dryers.

44.     During the period leading up to Arcelik's decision to use capacitors containing Zytel, DuPont widely marketed Zytel as having properties (including heat and humidity

resistance) that made it suitable for use in Arcelik's dryers.  These marketing materials were published by DuPont, not by any of its subsidiaries.

45.     For example, in a March 2003 publication entitled *DuPont – Zytel® Product Guide and Properties*, DuPont represented that Zytel possessed electrical resistivity of 10,000 megohms under humid conditions—which would have made it suitable for use in Arcelik's dryers had it been true for all batches.

46.     In a June 2001 publication entitled *DuPont- Minlon® and Zytel® Design Information – Module II*, DuPont represented that Zytel was "generally used in electrical applications requiring 600 volts or less" (such as the dryer capacitors), and that "ZYTEL® nylon resins are resistant to hot water and steam. Thus, ZYTEL® has found wide uses in such applications as hot water mixing valves, gears and baskets, equipment used for conveying in hot water and parts which must be subjected to steam."

47.     On DuPont's website, on a page entitled *Electrical & Electronic Plastics*, DuPont stated that Zytel was "tough, light and resilient in hot, chemically aggressive and humid environments, making it an excellent choice for an electrical plastic."

48.     Elsewhere online, DuPont indicated that Zytel had "[e]xcellent insulating/electrical resistance," and that it was tested for "heat, humidity and chemical resistance."

49.     DuPont issued a press release specifically highlighting the use of Zytel in "small household appliances" including "washing machines and dishwashers."  In this same publication, DuPont explained that "[c]haracteristics that Zytel® offers to electrical component designs and requirements include an inherent UL94-V2 flame rating @ 0.4mm, and high arc ignition

resistance of HAI = PLC0,[2] CTI > 600 V[3] to prevent fire hazards that can be caused by conductor arcing."

50.    In DuPont's online *Material Data Center*, it provided documents noting that "Zytel® nylon resin typically is used in demanding applications in the automotive, furniture, domestic appliances, sporting goods and construction industry."

51.    In a publication entitled *Zytel/Minlon: Design Guide-Module II*, DuPont stated that "Zytel nylon resins are widely used in electromechanical parts because of their excellent mechanical properties, chemical resistance, heat resistance and satisfactory electrical properties." The same publication noted that Zytel had "electrical properties adequate for most power frequencies and voltages."

52.    In a document entitled *DuPont Zytel: Product Guide and Properties*, DuPont stated that "[t]he key features of ZYTEL® nylons are . . . good electrical and flammability properties."

53.    DuPont made various similar statements through various channels, including that "[m]ajor use" of Zytel® is "[f]or electrical connectors;" Zytel is "the choice for a wide variety of electrical applications;" and Zytel has "properties most commonly used by designers in selecting material for electrical applications."

54.    DuPont also provided a specification sheet for Zytel, written in 2007, which listed a number of characteristics with respect to its mechanical, electrical, and flammability qualities. This specification sheet included characteristics conveying suitability in electrical applications,

---

[2] High arc ignition resistance ("HAI") indicates the number of seconds that a material resists ignition when subjected to a high voltage low current arcing source.  Although HAI is measured in seconds, it may be expressed by means of its UL Performance Level Category ("PLC"), from 3 (worst) to 0 (best).

[3] Comparative Tracking Index ("CTI") is used to measure the electrical breakdown ("tracking") properties of an insulating material and is used for electrical safety assessment of electrical apparatuses. A CTI of >600V is considered to represent the highest level of performance.

including that Zytel had a UL Product Level Category of: (a) 2 for its Comparative Tracking Index;[4] (b) 1 for its High Voltage Arc Tracking Rate;[5] and (c) 0 for its High Current Arc Tracking Rate.[6]  These rating all indicated the suitability of Zytel for use as an insulator for low voltage applications such as tumble dryers.

55.    Furthermore, additional DuPont representations about Zytel, which were untrue with respect to the bad batch that caused Arcelik's dryers to catch fire, were communicated by publications of the Underwriters Laboratories LLC ("UL").  UL is an independent safety science company offering certification and testing services, as well as developing internationally-recognized product and testing standards for a variety of products.

56.    UL certifies polymer plastics for compliance to global standards "intended to mitigate the risks of fire, electric shock, personal injury, and environmental hazards."  UL certifies a plastic product's characteristics by issuing a data sheet known as a "Yellow Card," which the producer can show to potential direct-purchasers, end-users, and other interested parties.  Yellow Cards bear information relative to specific polymeric materials which a company has submitted to UL, and they are widely relied upon by industry participants to determine whether a polymer plastic is suitable for a particular application.

57.    For at least 15 years prior to 2012, UL issued Yellow Cards certifying that Zytel possessed certain characteristics relating to strength, flammability, electrical properties, and other categories.  The Yellow Card for Zytel, issued from 1996 to 2012, contained information

---

[4]Although CTI is measured in volts, it is often expressed by its PLC.  The categories range from 5 (worst) to 0 (best).

[5] High Voltage Arc Tracking Rate ("HVTR") is a test method used to assess the susceptibility to tracking of insulating materials that are exposed to high voltages outdoors.  While usually expressed in millimeters/min, the HVTR may also be expressed by its PLC, ranging from 4 (worst) to 0 (best).

[6] Similar to HVTR, High Current Arc Tracking Rate measures an insulating material's susceptibility to tracking while exposed to high currents.

about various electrical characteristics of Zytel indicating it was sufficient for use as an insulator in low-to-medium voltage electrical applications, including the rated voltage for the capacitors used by Arcelik.  Of particular relevance to Arcelik's application, the Yellow Card reflected that Zytel had: (i) a flame retardancy class of V-0 down to 0.35mm thickness;[7] (ii) an electric relative temperature index of 130;[8] (iii) a comparative tracking index of 2; (iv) a high voltage tracking resistance of 1; (v) a dielectric strength of 25 kV/mm;[9] and (vi) volume electrical resistivity of 10,000 megohms.

58.     The Yellow Card for Zytel states that "[t]he information presented on this data sheet was acquired by UL IDES from the producer of the material," *i.e.*, DuPont.

59.     DuPont disseminated the information on Zytel's UL Yellow Card relating to Zytel's electrical resistivity to its customers for their consideration of whether Zytel was suitable for their purposes.  On its website and through its product guides, DuPont encouraged customers to "[s]ee [Zytel's] UL 'Yellow Card,' available from your DuPont sales office, for complete information."

60.     In short, DuPont made numerous, repeated representations that reflected Zytel's suitability for use in home appliances such as dryers that require that the insulation material perform under conditions of high heat and humidity.  Those with expertise in the electrical-appliance-manufacturing industry would understand DuPont's representations about Zytel (including those set forth above) to convey, both individually and collectively, that Zytel was appropriate for use in the capacitors incorporated into Arcelik's tumble dryers.

---

[7] Rating "V-0" is the highest rating for flame retardancy.

[8] Relative temperature index denotes the maximum service temperature (in degrees Celsius) for a material where specific properties are not unacceptably compromised.

[9] Dielectric strength is defined as the maximum voltage required to produce a dielectric breakdown through the material and is expressed as volts per unit thickness.  25kV equals 25,000 V.

61.     Arcelik relied on DuPont representations in selecting a capacitor that used Zytel to incorporate into its dryers.  Indeed, DuPont actively encouraged such reliance by touting its quality controls and thoroughness of its research and development efforts.  For example, on its webpage entitled *Electrical and Electronic Plastics*, DuPont stated: "Applications such as electrical and electronic housings, enclosures, sockets, switches and wiring components can leverage the strong and extensive research and development efforts that DuPont has committed to its DuPont™ Zytel . . . engineering polymers."

DuPont Lacked Any Basis for These Representations

62.     The ionic contamination of the defective Zytel severely degraded its electrical properties and foreclosed its suitability for use in even low-voltage electrical applications, especially in hot and humid conditions where mobility of the free ions was increased.  Thus, each of DuPont's aforementioned representations as to the qualities and characteristics of Zytel was false with respect to the defective batches of the material.

63.     At all times relevant to this lawsuit, DuPont did not test, sample, or take any other action to determine whether the Zytel it was producing complied with the representations made by DuPont about its qualities and characteristics.

Arcelik's Resulting Injuries

64.     Arcelik sold dryers manufactured with the contaminated Zytel.  It subsequently received notice that many of these dryers were catching fire.  These fires caused property damage and presented a serious safety hazard for hundreds of Arcelik's customers.

65.     Arcelik incurred substantial out-of-pocket expense in remedying the situation, which included initiating a voluntary recall of affected dryers and compensating customers for various other property damage caused by the dryer fires.  Arcelik suffered various other injuries

as well, including without limitation injury to its reputation as a result of dryer fires being associated with its brand.

DuPont China and DuPont India Were Agents of DuPont

66.     DuPont China and DuPont India were agents of DuPont with respect to the manufacture and sale, respectively, of Zytel.  Zytel is marketed by DuPont as a DuPont product developed by DuPont and sold on the strength of the DuPont brand.  DuPont has chosen to run its global Zytel business through a variety of subsidiaries worldwide, which serve as DuPont agents to which DuPont delegates discrete responsibilities.  DuPont China was one of several wholly-owned DuPont subsidiaries that had been delegated Zytel manufacturing responsibilities, and DuPont India was one of several wholly-owned DuPont subsidiaries that had been delegated Zytel sales responsibilities.  These subsidiaries do not have interests independent from their parent, DuPont, with respect to the manufacture and sale of Zytel.  They operate in practice as arms or divisions of DuPont, responsible for producing or selling this DuPont product for the benefit of DuPont and under the direction and control of DuPont.

67.     This conclusion is supported by the fact that DuPont commonly refers to plants that manufacture Zytel as "DuPont manufacturing sites," both externally and internally, even when the plant at issue is owned in the name of a DuPont subsidiary.  For example, the September 2012 DuPont report on the faulty Zytel noted above stated that implementation of corrective action to fix the problems with DuPont's Zytel would occur at "each affected DuPont manufacturing site across the globe."

68.     DuPont routinely refers to DuPont China in particular as a DuPont "manufacturing site," without mentioning that DuPont China is technically a separately incorporated entity.  For example, in a July 9, 2008 DuPont press release entitled "DuPont to Expand Capacity in China to Accelerate Growth for Engineering Resins in Asian Markets,"

DuPont asserted: "**DuPont** (NYSE: DD) today announced an expansion of compounding capacity for **its range of DuPont™ Zytel®** nylon 6,6 resins and DuPont™ Zytel® HTN high performance polyamide resins at **its manufacturing site in Shenzhen, China**."  (emphasis added)  The same press release continued to quote the Vice President and General Manager of one of DuPont's divisions, Keith J. Smith, as stating: "Our continued investment in **the Shenzhen site** demonstrates our commitment to reinforce our position . . ."  (emphasis added)  The press release does not disclose that DuPont's "manufacturing site in Shenzhen, China" is technically owned in the name of a DuPont subsidiary (DuPont China); reading the press release, one would be left with the impression that DuPont directly owned that "site," which is a reflection of the reality that DuPont exercises total control over DuPont China.

69.     An April 2, 2012 "DuPont News" bulletin published on DuPont's website provides yet another example of DuPont's treatment of DuPont China as merely an arm of DuPont.[10]  That bulletin is entitled, "**DuPont Shenzhen Site** Recognized as 'Benchmark Enterprise' in Low-Carbon Operation."  (emphasis added)  The first sentence of the bulletin states: "**The DuPont site at Shenzhen**, Guangdong Province, China, recently was named one of South China's 'Benchmark Enterprises in Low-carbon Production' for its outstanding efforts in reducing energy consumption . . ."  (emphasis added)  Consistent with the July 2008 press release, DuPont China's name (*i.e.*, E.I. DuPont China Holding Co. Ltd.) appears nowhere in the bulletin, nor does DuPont mention that the "DuPont site at Shenzhen" is technically owned by a subsidiary.  To the contrary, the bulletin concludes with the following two sentences that further reinforce the conclusion that DuPont China was an agent of DuPont: "**The Shenzhen site** began operation in 1989 and was **the first DuPont operation facility in China**.  The multi-business

---

[10] *See* http://www2.dupont.com/media/en-us/news-events/april/low-carbon-operation.html (available as of October 19, 2016).

site now has about 800 employees and **manufactures various products for four businesses**:

Performance Polymers, Chemicals & Fluoroproducts, Electronics & Communications and

Packaging & Industrial Polymers." (emphasis added) The "four businesses" cited are DuPont

divisions, including the division responsible for Zytel, Performance Polymers.

     70.    The materials DuPont has submitted in this case further support the conclusion

that DuPont India and DuPont China are agents of DuPont. DuPont filed 100 pages of Zytel

specification sheets and marketing materials as exhibits to its motion to dismiss. (Exhibit B, D.I.

7-2; Exhibit C, D.I. 7-3; Exhibit D, D.I. 7-4; Exhibit E, D.I. 7-5; Exhibit E, D.I. 7-6.) Neither

DuPont India nor DuPont China are mentioned even once in those 100 pages. Instead, all of

these materials were published by DuPont, refer only to "DuPont" Zytel, and make no

distinctions among DuPont's Zytel based on which DuPont subsidiary manufactures or sells the

Zytel. Moreover, a close exhibit-by-exhibit review reveals additional details that support the

conclusion that there is a single, undifferentiated global "DuPont Zytel" business that is run

exclusively by DuPont and over which DuPont exercises complete control:

     A.    Exhibits B and C are specification sheets for Zytel which refer to

"DuPont™ Zytel®." (D.I. 7-2, 7-3.) A message appearing on the bottom of every page of both

documents asserts that, "[t]he DuPont Oval Logo, DuPont™, The miracles of science™, and

Zytel® are registered trademarks of DuPont Company." DuPont Company is an alternative

name used to refer to "E. I. du Pont de Nemours and Company," *i.e.*, the U.S. parent that is the

defendant in this case. The DuPont logo and its "miracles of science" trademark appear on the

bottom right of every page of both documents, and a link to DuPont's website

("plastics.dupont.com") appears on the bottom left of every page. Neither DuPont China nor

DuPont India is identified on these Zytel specification sheets.

B.      Exhibit D is a product guide for Zytel.  (D.I. 7-4.)  The cover of the guide refers to "DuPont™ Zytel®" and includes the DuPont logo and the "miracles of science™" trademarked phrase.  A message on the cover page clarifies that these are "[r]egistered trademarks of E.I. du Pont de Nemours and Company."  The guide does not contain any reference to DuPont China or DuPont India.

C.      Exhibit E is a "design information" guide for Minlon and Zytel.  (D.I. 7-5.)  The document presents the history of Zytel's development by DuPont, repeatedly representing that this was a DuPont product developed by DuPont and touting the fact that DuPont makes decisions about its manufacturing to reduce environmental impact.  (*See, e.g., id.* at 6 ("The invention of nylon by DuPont"); *id.* ("the DuPont nylon resin product line"); *id.* ("the DuPont nylon family"); *id.* ("DuPont has developed"); *id.* at 7 ("the glass reinforced DuPont nylon resin families"); *id.* ("Injection moulding is the most common method for producing parts of DuPont nylon resins"); *id.* at 9 ("By selecting the best colourants and other additives, given the knowledge of the impact on the environment of these additives today, DuPont tries to minimize or avoid any effect on the environment"); *id.* at 10 ("Economic incentives for using DuPont nylons").)

D.      Exhibit F is a copy of Zytel's UL specification sheet, which associates the product only with "E I DUPONT DE NEMOURS & CO INC," and provides a Delaware address for the company.  (D.I. 7-6.)

71.     Further, as noted above, when the Zytel manufactured by DuPont China (among other manufacturing sites) and sold by DuPont India (among other sales agents) turned out to be faulty, it was not DuPont China or DuPont India that investigated the problem or provided notice to customers.  Rather, it was DuPont, the U.S. parent, that investigated the issue, determined that

the Zytel was faulty, concluded that the cause was issues with flame retardant material sourced from one of its suppliers, and sent correspondence to affected Zytel customers, regardless of which particular DuPont sales agent had handled the sale or which DuPont manufacturing site had produced the Zytel.

72.     It is reasonable to infer based on known facts alleged above that, after concluding that the problems with the bad batches of Zytel were attributable to flame retardant material supplied by a particular supplier, DuPont directed DuPont China (and all other DuPont manufacturing sites) to cease purchases from that supplier and instead purchase the necessary material from an alternative supplier.  It is also reasonable to infer that DuPont instructed DuPont India (and all other DuPont sales agents) to cease sales of the bad batches of Zytel.

73.     At all relevant times, DuPont had and exercised plenary authority to dictate the actions of DuPont China and DuPont India with respect to the manufacture and sale of DuPont Zytel.  DuPont China and DuPont India acted on behalf of DuPont with respect to the manufacture and sale of the Zytel that caused Arcelik's dryers to catch fire.

## CLAIM ONE
## NEGLIGENT MISREPRESENTATION

74.     Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

75.     DuPont's misrepresentations about Zytel were made by DuPont in the course of its commercial business, in which it has a pecuniary interest—namely, for the purpose of inducing its direct purchasers, end-users, and other industry participants, including Arcelik, to purchase Zytel and components that incorporate Zytel for use in various electrical applications, including tumble dryers.

76.     DuPont is in the business of supplying information, including to promote products that it sells, including Zytel.

77.     DuPont supplied the information to its direct purchasers, end-users, and other industry participants, including Arcelik, specifically to provide them guidance in their manufacturing decisions and business transactions with DuPont and with third parties.

78.     Arcelik is one of a limited group of persons – *i.e.*, end-users of Zytel – for whose benefit and guidance DuPont intended to supply the information.   DuPont's representations about Zytel were not written for the public at large; rather, they were written specifically for engineers, product design experts, and other knowledgeable industry participants considering the suitability of Zytel in various manufacturing applications, such as incorporation into capacitors used in Arcelik's dryers.

79.     DuPont's misrepresentations were the foreseeable cause of the dryer fires. Arcelik selected Zytel for use in its electrical dryers in reliance on these representations.  The defective Zytel did not possess the electrical characteristics that DuPont represented, leading to the electrical fires.

80.     Arcelik was aware of DuPont representations about Zytel and relied on them in determining whether to use electrical components containing Zytel in their manufacturing process.  Arcelik's reliance was justifiable and reasonable, including because it reasonably believed DuPont had some process to mitigate the risk of ionic contamination, DuPont had superior knowledge about Zytel's characteristics, DuPont represented that its word could be trusted in light of its experience and quality control procedures, and certain of the DuPont representations were conveyed via UL, whose certifications are globally recognized.

81.     Arcelik's losses resulted from a transaction of the kind that DuPont intended its statements to influence—specifically, the selection and purchase of components containing Zytel, based on Zytel's perceived electrical characteristics.

82.     DuPont failed to exercise reasonable care or competence in obtaining and communicating the information because it had no process for measuring, and did not measure, Zytel's electrical resistivity, and therefore had no basis for believing that Zytel's reported electrical properties were accurately reflected by, or would remain consistent with, published data.  It was further unreasonable for DuPont to make these statements when it took no steps to detect or prevent ionic contamination of Zytel, which DuPont knew would severely denigrate Zytel's electrical characteristics, especially under humid conditions.

83.     The dryer fires, and Arcelik's resulting injuries, were directly and proximately caused by faulty Zytel that did not comply with representations that DuPont had made about the product.

## CLAIM TWO
## FRAUDULENT MISREPRESENTATION

84.     Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

85.     DuPont purposefully directed its misrepresentations of fact about Zytel to its direct purchasers, end users, and other industry participants, including Arcelik, for the purpose of inducing them to purchase Zytel for use in various applications, including electrical appliances such as dryers.

86.     The representations and/or omissions about Zytel's electrical characteristics and suitability for use in electric applications were false and misleading with respect to the defective batches of Zytel.

87.     DuPont's misrepresentations about Zytel were made with a reckless disregard for the truth.  DuPont knew that it lacked any basis for these representations because it did not measure the electrical resistivity of the Zytel it produced and did nothing to measure or to detect or mitigate the risk of ionic contamination of Zytel, which it knew would severely degrade the product's electrical and flammability characteristics and suitability for use in electrical appliances.

88.     DuPont also knew that the specific flame-retardant material used in Zytel produced free ions as byproduct.  DuPont further knew that the effects of ionic contamination would be amplified within humid environments, and that Zytel, as a nylon polymer, as particularly prone to absorb moisture.

89.     These misrepresentations were material; electrical characteristics are of paramount importance in selecting the components of electric appliances.  The use of insufficiently resistant material creates a high likelihood of electrical arc fires, which may cause property damage and injury.

90.     Arcelik was aware of DuPont representations about Zytel and relied on them in determining whether to use electrical components containing Zytel in their manufacturing process.  Arcelik's reliance was justifiable and reasonable, including because it reasonably believed DuPont had some process to mitigate the risk of ionic contamination, DuPont had superior knowledge about Zytel's characteristics, DuPont represented that its word could be trusted in light of its experience and quality control procedures, and certain of the DuPont representations were conveyed via UL, whose certifications are globally recognized.

91.     The dryer fires, and Arcelik's resulting injuries, were directly and proximately caused by faulty Zytel that did not comply with representations that DuPont had made about the product.

## CLAIM THREE
## VIOLATION OF DELAWARE CONSUMER FRAUD ACT
### (DEL. CODE ANN. Tit. 6, §§ 2511 – 2527)

92.     Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

93.     DuPont's marketing materials, advertisements, product guides, and other materials misrepresented the electrical characteristics of Zytel with the intent that its customers, end-users, and others would rely upon those representations in connection with the sale of Zytel.

94.     DuPont made these representations to induce, directly or indirectly, end users such as Arcelik to utilize components made from Zytel.

95.     DuPont also concealed or omitted material facts, including the fact that it had no process for measuring the electrical-resistivity characteristics or detecting ionic contamination of Zytel, with the intent that its customers, end-users, and others would rely upon such concealment or omission in connection with the sale of Zytel.

96.     DuPont authored, published, and disseminated these misrepresentations from the state of Delaware.

97.     The dryer fires, and Arcelik's resulting injuries, were directly and proximately caused by faulty Zytel that did not comply with representations that DuPont had made about the product.

**CLAIM FOUR**
**NEGLIGENT MANUFACTURE OF A DEFECTIVE PRODUCT**

98.     Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

99.     DuPont is engaged in the business of manufacturing, selling, or otherwise distributing Zytel, both directly and through global subsidiaries, such as DuPont China and DuPont India, who act as agents under the direction and control of DuPont.

100.    DuPont owes a duty to the public and to any users of the product to exercise reasonable care, skill, and diligence in the manufacture of Zytel, especially in light of the serious harm likely to result from its defectiveness in electrical applications.

101.    DuPont failed to exercise reasonable care in manufacturing Zytel such that the product contained a manufacturing defect when placed into the stream of commerce.

102.    The Zytel was defective at the time of sale because it contained an additive that was contaminated with ionic material, which severely degraded Zytel's electrical characteristics.

103.    Specifically, DuPont did not exercise reasonable care when manufacturing Zytel because it did nothing to detect or mitigate the risk of ionic contamination, despite its knowledge that, because of the nature of the flame-retardant additive, such contamination was likely to occur and would severely degrade the product's electrical and flammability characteristics and suitability for use in electrical appliances.

104.    DuPont also knew that the specific flame-retardant material used in Zytel produced free ions as byproducts, that the effects of ionic contamination would be amplified within humid environments, and that Zytel, as a nylon polymer, was particularly prone to absorb moisture.

105.    The dryer fires, and Arcelik's resulting injuries, were directly and proximately caused by the defective Zytel.  No other component of the tumble dryers was defective in and of itself.

## CLAIM FIVE
## TORTIOUS INTERFERENCE WITH A CONTRACT

106.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

107.    On August 31, 2009, Arcelik entered into a contract with Epcos for the purchase of capacitors to be used in its line of electric dryers.  Following an extension by mutual agreement on October 3, 2011, the term of the contract ended on December 31, 2012.

108.    The contract required Epcos to supply capacitors possessing certain specifications related to their electrical capabilities, including the capability of performing at their rated level of voltage, in hot and humid conditions.

109.    Based on information and belief, DuPont and its subsidiary and agent DuPont India were aware of this contract.

110.    DuPont, through its misrepresentations about Zytel's electrical capabilities and its sale of defective Zytel, caused Epcos not to perform its contractual obligations.  Specifically, Epcos selected Zytel in reliance on its represented characteristics, and the capacitors caught fire as a result of the defective Zytel.

111.    Furthermore, DuPont knew that the interference was certain or substantially certain to occur as a result of its repeated representations about Zytel, coupled with its lack of any basis to make those representations.

112.    DuPont's interference with the contract between Arcelik and Epcos caused Arcelik's injuries.

113.    DuPont had no legitimate adverse business interest or other justification for interfering with the contract.

## REQUESTED RELIEF

114.    Based on the preceding allegations and claims, Plaintiff respectfully requests:

A.    That the Court award Plaintiff compensatory damages against Defendant for its violations of law, in an amount to be determined by this Court, plus interest;

B.    That the Court award Plaintiff its costs of suit, including reasonable attorneys' fees and expenses;

C.    That the Court direct such further relief as it may deem just and proper.

Dated: October 21, 2016

Respectfully submitted,

OF COUNSEL:

Jonathan L. Greenblatt
Keith R. Palfin
SHEARMAN & STERLING LLP
401 9th Street, NW, Suite 800
Washington, D.C.  20004
Telephone: (202) 508-8000
Facsimile: (202) 508-8100
jgreenblatt@shearman.com
kpalfin@shearman.com

_/s/ John M. Seaman_____
John M. Seaman (#3868)
ABRAMS & BAYLISS LLP
20 Montchanin Road, Suite 200
Wilmington, DE  19807
Telephone: (302) 778-1000
Facsimile: (302) 778-1001
seaman@abramsbayliss.com