**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ARÇELIK, A.Ş., | |
| Plaintiff, | |
| v. | Civil Action No. 15-00961-TBD |
| E.I. DU PONT DE NEMOURS AND COMPANY, | |
| Defendant. | |

**MEMORANDUM OPINION**

Pending before the court is Defendant E.I. Du Pont de Nemours and Company's motion for summary judgment on all four of Plaintiff Arçelik, A.Ş.'s remaining claims for damages arising from its recall of defective clothes dryers. These claims are: (1) negligent manufacture, (2) negligent misrepresentation, (3) violation of the Delaware Consumer Fraud Act, 6 Del. C. §§ 2511–2527, and (4) tortious interference with a contract. *See* Def.'s Mot. Summ. J., D.I. 187. Upon consideration of the parties' briefs, oral argument, and the record evidence, the court GRANTS Defendant's motion.

**I.    Background**

The following facts are either undisputed or are taken in the light most favorable to the non-movant, Plaintiff, Arçelik, A.Ş. ("Arcelik"). Arcelik is a Turkish consumer appliance company that manufactures and sells household appliances under multiple brands in over 100 countries. *See* Am. Compl., D.I. 19, ¶ 12. One of its product lines is electric tumble dryers for drying clothes. *Id.* ¶ 15. In October 2012, Arcelik began receiving customer complaints of its

electric tumble dryers catching fire.  *See* Pl.'s Ex. 14, at 23; Dep. of Polat Sen, Def.'s Ex. 4 ("Sen Tr."), at 28:8–11; Dep. of Gokhan Ozgurel, Pl.'s Ex. 7 ("Ozgurel Tr."), at 111:20–112:09.[1]  In response to the fires, Arcelik issued a voluntary recall of the affected dryers in European countries, offering to replace or repair all affected dryers and compensating customers for various property damage caused by the dryer fires.  *See* Pl.'s Ex. 14, at 23.  Arcelik maintains that it incurred substantial costs and other damages as a consequence.

The results of multiple independent investigations showed that the dryer fires were caused by a defect in a flame retardant that was incorporated into a nylon resin (or plastic material) called "Zytel FR50,"[2] which was incorporated in electrical capacitors,[3] which were in turn incorporated in Arcelik's dryers.  D.I. 29–1 ¶ 4; Pl.'s Ex. 14 at 23–24; Pl.'s Ex. 38; Pl.'s Ex. 43.  Arcelik alleges that the flame retardant contained higher than normal levels of sodium, bromide, and chloride-free ions, resulting in "ionic contamination" that lowered the Zytel FR50's electrical resistivity in the presence of high temperatures and humidity levels.  *See* Pl.'s Ex. 14, at 19, 24; Pl.'s Ex. 23, at DUP0006371–72.  This in turn caused the dryers to overheat and catch fire.

Defendant E.I. Du Pont de Nemours and Company ("DuPont") asserts that it did not manufacture or sell the Zytel FR50.  *See* Def.'s Br. Supp. Summ. J. ("Def.'s Mot."), D.I. 188, at 16.  Rather, various entities not parties to this action were involved in the Zytel FR50

---

[1]  Citations to "Pl.'s Ex. __" are to the public versions of Exhibits 1–49 attached to the Affidavit of April M. Ferraro, D.I. 197, located at D.I. 199-1-199-4.  Citations to "Def.'s Ex. __" are to Exhibits 1–35 attached to the Affidavit of Clarissa R. Chenoweth-Shook, D.I. 189, located at D.I. 189-1–194.

[2]  Zytel® ("Zytel") is the trade name for a family of nylon resins that are manufactured and sold by Defendant E.I. Du Pont de Nemours and Company and certain of its subsidiaries.  *See* Def.'s Ex. 12.  Zytel FR50 is a specific type of Zytel that incorporates a flame retardant ("FR").

[3]  A capacitor is an energy-storing device designed to regulate and maintain the flow of electric current to the motor powering the device.  Am. Compl. ¶ 16.  "Capacitors store an electrical charge on two conductive plates separated by an insulating layer within the cylindrical case, and connect to a circuit by way of two 'terminal lugs' protruding from one end."  *Id.*

manufacturing processes.   The flame retardant was produced by a Chinese company named Shandong Brother, which is neither owned nor controlled by DuPont.  Starting in 2010, Shandong Brother sold the flame retardant to another Chinese company, DuPont China Holding Co. Ltd. ("DuPont China") (a DuPont subsidiary), which used it in the manufacture of Zytel FR50 (the plastic material) at its plant in Shenzhen, China.  *See* Dep. of Richard A. Mayo, Pl.'s Ex. 2 ("Mayo Tr."), at 08:22–10:12; Decl. of Richard Mayo ¶ 5; Dep. of David Donofrio, Pl.'s Ex. 4 ("Donofrio Tr."), at 49:05–09.  DuPont China then sold the Zytel FR50 containing the Shandong Brother flame retardant to E.I. Du Pont India Private Limited ("DuPont India") (another DuPont subsidiary), which in turn sold it to non-party EPCOS India, an entity neither owned nor controlled by DuPont.  *See* Pl.'s Ex. 20, at 20–21; Mayo Tr. 32:12–33:1, 33:21–24; Answer to Am. Compl. ¶ 18, D.I. 47.

Either EPCOS India or EPCOS AG—a related German entity and subsidiary of TDK Corporation (a Japanese Corporation)—used the Zytel FR50 as a component part in the manufacture of electrical capacitors that were sold to Arcelik.  *See* Answer ¶ 127.  The Zytel FR50 was used to form the top disc that "seals the body of the capacitor case from the terminal lugs and also includes a 'shield' that separates the terminal lugs from each other," as shown in the following illustration:



Am. Compl. ¶ 21.  EPCOS AG then sold the electrical capacitors containing Zytel FR50 to Arcelik pursuant to a contract the two companies entered into in 2009.  *Id.* ¶ 107; Ozgurel Tr. 50:22–51:02. The capacitors were incorporated in Arcelik's dryers.

On October 22, 2015, Arcelik initiated this action for damages related to the dryer fires caused by the defective Zytel FR50, raising six claims under both Delaware common law and the Delaware Consumer Fraud Act ("DCFA").  *See* Compl., D.I. 1., ¶¶ 103–10.[4]  Arcelik did not bring suit against any of the above-mentioned direct participants in the manufacturing process, but rather against DuPont, the Delaware-based parent company of DuPont China and DuPont India. Defendant DuPont moved to dismiss the complaint on various grounds.  Def.'s Br. Supp. Mot. to Dismiss, D.I. 7.

The court granted DuPont's motion to dismiss, in-part because Arcelik had failed to "adequately allege agency relationships between DuPont and any entities under its direction or control."  Mem. Order 6, D.I. 16.  Five of the six claims were dismissed without prejudice.  *Id.* at 1.  (The breach of implied warranty claim was dismissed with prejudice.)  Arcelik subsequently filed an Amended Complaint reasserting those five claims and adding allegations regarding the agency relationship between DuPont and its subsidiaries.  Am. Compl. ¶ 17.

DuPont again moved to dismiss, this time on the basis that, even assuming DuPont's subsidiaries were agents of DuPont, Arcelik had failed to state any claim upon which relief could be granted.  Mem. Op., D.I. 36 at 3 (citing Stipulation & Proposed Order re Renewed Mot. to Dismiss, D.I. 27 at 3).  On March 20, 2018, the court granted in part and denied in part DuPont's motion.  *Id.* at 1.  In its memorandum opinion, the court first held that EPCOS

---

[4]  Those six claims were:  (1) negligent misrepresentation, (2) fraudulent misrepresentation, (3) breach of implied warranty, (4) violation of the DCFA, (5) negligent manufacture of a defective product, and (6) tortious interference with a contract.  *See* Compl. ¶¶ 15–23.

AG and EPCOS India were not necessary parties under Rule 19.  *Id.* at 5–8.  On the merits, the court held:  (1) the economic loss doctrine did not require dismissal of Arcelik's negligence claims, (2) Arcelik had sufficiently pled its negligent misrepresentation, DCFA, and tortious interference with a contract claims, and (3) Arcelik had failed to adequately plead its fraud claim.  *See id.* at 8–16.

As a result of that ruling, Arcelik was left with four claims:  (1) negligent manufacture, (2) negligent misrepresentation, (3) violation of the DCFA, and (4) tortious interference with a contract.  *Id.* at 8–16.  The case was previously assigned to the Honorable Leonard P. Stark and was reassigned on March 11, 2022, following the decisions on the motions to dismiss and the conduct of most of the discovery, to the undersigned, a United States Circuit Judge on the Court of Appeals for the Federal Circuit sitting in this district by designation.  *See* 3/11/22 Min. Entry.

Following discovery, on May 23, 2022, DuPont moved for summary judgment on all four surviving claims.  Def.'s Br. Supp. Summ. J. ("Def.'s Mot."), D.I. 188, at 9.  The parties' briefing on the motion for summary judgment concluded on June 27, 2022, *see* Def.'s Reply Supp. Summ. J. ("Def.'s Reply"), D.I. 200, and on July 12, 2022, the court heard oral argument on the motion, *see* 7/12/22 Min. Entry.

The court has jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332.  *See* Am. Compl. ¶ 10.  The parties have stipulated that Delaware law governs each of Arcelik's claims.  *See* Stip. & Proposed Order re Choice of Law, D.I. 139,  at 1.

## II.  Legal Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The moving party bears the burden of

demonstrating the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  If the moving party has carried its burden, the nonmovant must then "come forward with 'specific facts showing that there is a *genuine issue for trial*.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). "[T]he court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

## III.    Discussion

At the outset, the court notes that it has been somewhat difficult to parse exactly what Arcelik's contentions are since they have not been articulated with clarity in many instances, and many of Arcelik's contentions have changed throughout the course of the litigation.  The court now understands the following four theories to be asserted.

### A.    Negligent Manufacture

Arcelik argues that DuPont is directly liable for the negligent manufacture of the Zytel FR50.  7/12/22 Hr'g Tr., D.I. 203, at 06:06–07:01.  The negligent act, Arcelik alleges, is that "DuPont did not exercise reasonable care when manufacturing Zytel because it did nothing to detect or mitigate the risk of ionic contamination, despite its knowledge that, because of the nature of the flame-retardant additive, such contamination was likely to occur and would severely degrade the product's electrical and flammability characteristics and suitability for use in electrical appliances."  Am. Compl. ¶ 103.  Arcelik points to the following facts as evidence that DuPont is the manufacturer of the allegedly defective Zytel FR50:  1) DuPont sets the global manufacturing standards for Zytel FR50, including setting the specifications for raw materials, *see* Hr'g Tr. 41:15–17, 42:05–22, 44:06–11; 2) DuPont qualifies suppliers of raw materials in accordance with

6

those standards, *see id.* at 48:08–16, 46:16–47:06; 3) DuPont requires suppliers to provide Certificates of Analysis ("COAs") showing compliance with DuPont's specifications, *see, e.g.*, Pl.'s Ex. 23 at DUP0006377, and 4) DuPont interfaces with customers on product complaints and deficiencies when the products do not meet the standards, *see id.* at 51:12–18.[5]

In the alternative, Arcelik argues that DuPont is vicariously liable for the negligent acts of DuPont China because it acted as DuPont's agent in manufacturing Zytel.[6]  Pl.'s Opp'n 13–16.

DuPont argues that summary judgment should be granted in its favor on this claim because DuPont "is not liable for any of the conduct Arcelik alleges in its Amended Complaint."  Def.'s Mot. 16.  Specifically, DuPont contends, Arcelik has not properly raised such a direct manufacture theory or adduced facts sufficient to create a material issue of fact as to whether DuPont itself is the manufacturer of the Zytel FR50 or whether DuPont China is an agent of DuPont with respect to the manufacture of Zytel FR50.  *See id.* at 16–23; *see also* Hr'g Tr. 18:01–15.

### 1.  The Direct Manufacture Theory

Arcelik failed to set forth a direct manufacture theory in the Amended Complaint or in its opposition to DuPont's motion for summary judgment.  The theory was raised for the first time at oral argument on the summary judgment motion, and thus was not timely raised.[7]

---

[5]  *See also* Pl.'s Opp'n, D.I. 196, at 12, 16 (citing Dep. of Robert Lawton, Ph.D. Pl.'s Ex. 1 ("Lawton Tr."), at 190:11–13, 191:16–18, 192:16–17, 346:04–06).
[6]  Arcelik also alleges DuPont India was an agent of DuPont, *see, e.g.*, Pl.'s Opp'n 13, but as DuPont India's actions are of unclear relevance to Arcelik's negligent manufacture claim as framed, the court focuses its discussion on DuPont China.
[7]  *See, e.g.*, *Miranda-Rivera v. Toledo-Davila*, 813 F.3d 64, 76 (1st Cir. 2016) ("Plaintiffs may not 'raise new and unadvertised theories of liability for the first time in opposition to a motion for summary judgment . . . .'" (quoting *Calvi v. Knox Cty.*, 470 F.3d 422, 431 (1st Cir. 2006))); *Whitaker v. Milwaukee*, No. 12-CV-1006-JPS, 2013 WL 6002067, at *7 (E.D. Wis. Nov. 12, 2013) ("[A] party may not raise new theories of liability in opposition briefing to a motion for summary judgment."), *aff'd* 772 F.3d 802 (7th Cir. 2014).

The direct manufacture claim also fails on the merits because Arcelik has not shown that DuPont manufactured the Zytel FR50.  Indeed, Arcelik appears to admit that there is no evidence of DuPont's control over the overall manufacturing process.  Hr'g Tr. 45:17–18 (counsel for Arcelik stating, "[t]here's nothing in the record about the actual manufacture of Zytel [by DuPont], broadly"); *see also id.* at 44:20–45:05 (The court: "[W]here is the evidence that DuPont controlled the day-to-day manufacture of this product?"  Counsel for Arcelik: "It does not.  [DuPont], itself, is not making those decisions.").[8]  Arcelik's theory seems to be that DuPont is directly liable for negligent manufacture because it controlled the quality control aspect of the Zytel FR50 manufacturing process.  *See id.* at 43:09–16; Pl.'s Opp'n 15–16.  That theory is not supported by the record.

Arcelik has presented no evidence that DuPont controlled the day-to-day quality control process for manufacturing Zytel FR50.  DuPont employees testified that once the Zytel product specifications were set, "the manufacturing location in China [was] responsible [for making] sure that the product me[t] the[] specifications and standards."  Mayo Tr. 39:01–03; *see also* Donofrio Tr. 48:16–20 ("[E]ach of th[e] plant managers was responsible for auditing against th[e] standard -- having third-party audits against that standard at least annually.").

---

[8]  Given Arcelik's concession, there is no significance to testimony that could be interpreted to state that DuPont China was not running day-to-day operations.  *See* Pl.'s Opp'n at 15 (quoting Mayo Tr. 74:12–19).

   Counsel for Arcelik asserted at oral argument that DuPont owns the manufacturing plant in China where the allegedly defective Zytel FR50 was produced, citing the deposition testimony of DuPont's 30(b)(6) witness, Richard Mayo.  *See* Hr'g Tr. 41:01–09 (portraying Mayo testimony as describing the manufacturing plant as "our [(as in DuPont's)] asset in China").  In fact, Mr. Mayo testified that "the Shenzhen manufacturing plant asset was owned by DuPont China Holding," Mayo Tr. 08:24–09:01; *see also id.* at 74:05–06 ("The Zytel assets that are in China . . . are legally owned by the DuPont China legal entity . . . .").  Even if DuPont owned the manufacturing plant, that would not make it the manufacturer of the Zytel FR50.

Even with respect to the flame retardant, specifically, there is no evidence that DuPont controlled the quality control process.  Arcelik complains that DuPont did not do so.  *See, e.g.*, Am. Compl. ¶ 82 ("DuPont . . . had no process for measuring, and did not measure, Zytel's electrical resistivity."); *id.* ("DuPont . . . took no steps to detect or prevent ionic contamination."); *id.* ¶ 95 ("DuPont . . . had no process for measuring the electrical-resistivity characteristics or detecting ionic contamination of Zytel"); Hr'g Tr. 65:20–66:17 (reciting same); Pl.'s Opp'n 5, 7 ("DuPont never independently verified the information on any of Shandong Brother's COAs [showing compliance with DuPont's specifications].").  There is evidence that DuPont set the standard for the flame retardant, signed off on the qualification of the third-party supplier, required that the supplier provide certificates of analysis with each shipment showing compliance with the specification, and investigated problems that arose.[9]  But setting the standard for the flame retardant, signing off on the qualification of the supplier, requiring certificates of analysis, and investigating problems that arose do not amount to control of the quality control process to determine the day-to-day compliance with the specification.  Arcelik points to no authority, nor has the court otherwise found any, showing that such limited activity makes DuPont the overall manufacturer of the Zytel FR50.

2.  The Agency Theory

Under Delaware law, there are two limited exceptions to the general principle of corporate law "deeply 'ingrained in our economic and legal systems' that a parent corporation . . . is not liable for the acts of its subsidiaries."  *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) (quoting

---

[9]  *See, e.g.*, Mayo Tr. 39:04–10 (explaining that a "global business team" sets the standards for the specifications of Zytel FR50); Lawton Tr. 192:16–17 (showing Mr. Lawton "signed off" on DuPont China's evaluation of Shandong Brother); *id.* at 108:15–19, 109:04–14 (showing DuPont had a specification for the amount of ionic bromide in the flame retardant); Pl.'s Ex. 23, at DUP0006377 (showing example COA from Shandong Brother).

William O. Douglas & Carrol M. Shanks, *Insulation from Liability Through Subsidiary Corporations*, 39 Yale L.J. 193, 193 (1929)); *see Phx. Can. Oil Co. v. Texaco, Inc.*, 842 F.2d 1466, 1476–77 (3d Cir. 1988) (articulating the two standards).  The first is the alter ego (or piercing the corporate veil) theory, whereby a parent company is liable for the actions of a subsidiary over which it exercises "total domination" and control, and the second is a general agency theory.  *See Phx. Can. Oil*, 842 F.2d at 1476–77; *see also Applied Biosys., Inc. v. Cruachem, Ltd.*, 772 F. Supp. 1458, 1463 (D. Del. 1991).

Arcelik devotes a substantial portion of its opposition brief to arguing that DuPont and its subsidiaries operate as a single entity.  For example, it asserts that "Zytel FR50 is a *DuPont* product, not a DuPont China or DuPont India product," and "[n]one of DuPont's marketing materials mention that Zytel is manufactured by a purportedly distinct entity, nor do DuPont's customer communications draw distinctions between DuPont entities."  Pl.'s Opp'n 12 (citing Pl.'s Ex.'s 10–11, 29).  Arcelik also asserts that "DuPont [ ] saw no meaningful distinction between itself and its wholly-owned subsidiaries."  *Id.*  However, in its summary judgment opposition brief and at oral argument, Arcelik specifically disclaimed a veil-piercing (or alter ego) theory.  *See id.* at 14 ("Arcelik does not assert an alter-ego theory."); Hr'g Tr. 07:05–06 ("We are not asserting [an alter-ego argument].").  It has elected to proceed only on an agency theory.[10]

Under the agency theory of liability, "one corporation—completely independent of a second corporation—may assume the role of the second corporation's agent in the course of one

---

[10]  Similarly, since Arcelik concedes there is insufficient evidence to show piercing the corporate veil, there cannot be sufficient evidence to find DuPont exercises "actual, participatory, and *total*" control over its subsidiaries under some of the applicable district court cases articulating a total control agency theory.  *Japan Petroleum Co. (Nigeria) v. Ashland Oil, Inc.*, 456 F. Supp. 831, 841 (D. Del. 1978) (emphasis added); *see also Compagnie des Grands Hotels d'Afrique S.A. v. Starwood Cap. Grp. Glob. I*, No. 18-CV-654-RGA, 2019 WL 148454, at *5 (D. Del. Jan. 9, 2019).

or more specific transactions." *Phx. Can. Oil*, 842 F.2d at 1477.  That is, "[n]ot only must an

arrangement exist between the two corporations so that one acts on behalf of the other and within

usual agency principles, but the arrangement must be relevant to the plaintiff's claim of

wrongdoing," *id.*, in  this case, negligent manufacturing.

"Delaware agency law is consistent with the general common law."  *Id.* at 1477 n.4

(citing *Japan Petroleum*, 456 F. Supp. at 838–41 (applying Restatement (Second) of Agency)).

An agency relationship is a "fiduciary relationship that arises when one person (a 'principal')

manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and

subject to the principal's control, and the agent manifests assent or otherwise consents so to act."

*Metro Storage Int'l LLC v. Harron*, 275 A.3d 810, 843 n.14 (Del. Ch. 2022) (quoting Restatement

(Third) of Agency § 1.01).[11]  There are three essential attributes of an agency relationship:  (1) that

an agent "holds a power to alter the legal relations between the principal and [a third party],"

Restatement (Second) of Agency § 12; (2) that "[a]n agent is a fiduciary with respect to matters

within the scope of [the] agency," *id.* § 13; and (3) that "[a] principal has the right to control the

conduct of the agent with respect to matters entrusted [to the agent]," *id.* § 14.  *See Jack Eckerd

Corp. v. Dart Grp. Corp.*, 621 F. Supp. 725, 732 (D. Del. 1985); *see also C.R. Bard Inc. v. Guidant

Corp.*, 997 F. Supp. 556, 560 (D. Del. 1998) ("Under the agency theory, the court may attribute

the actions of a subsidiary company to its parent where the subsidiary acts on the parent's behalf

or at the parent's direction." (citing *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 271

---

[11]  *See also Transamerica Leasing, Inc. v. La Republica de Venezuela,* 200 F.3d 843, 849 (D.C.
Cir. 2000) ("At a minimum, however, . . . the relationship of principal and agent does not obtain
unless the parent has manifested its desire for the subsidiary to act upon the parent's behalf, the
subsidiary has consented so to act, the parent has the right to exercise control over the subsidiary
with respect to matters entrusted to the subsidiary, and the parent exercises its control in a manner
more direct than by voting a majority of the stock in the subsidiary or making appointments to the
subsidiary's Board of Directors.").

(D. Del. 1989))).  "The 'touchstone' of the agency relationship is the principal's right to control the agent."  *Id.* (quoting *Gov't of Virgin Islands v. Richards,* 618 F.2d 242, 244 (3d Cir. 1980) (citing Restatement (Second) of Agency § 14)).

Arcelik has not shown that the relationship between DuPont and its subsidiaries, as to the manufacture of Zytel FR50, satisfies that standard for two reasons:  (1)  there is no evidence that the subsidiaries acted on DuPont's behalf in dealing with third parties, and (2) Arcelik does not contend that DuPont controlled the overall manufacturing process.

The record evidence shows that the FR50 was manufactured by DuPont China at a plant in Shenzhen, China.  *See* Mayo Tr. 08:23–09:01; 38:18–39:3.  There is no evidence that DuPont China manufactured the Zytel FR50 "on [DuPont's] behalf" or at DuPont's direction to fulfill a DuPont obligation to a third-party.  *Metro Storage*, 275 A.3d at 843 n.14.  For example, Arcelik has not produced any evidence showing that DuPont China was fulfilling Zytel orders for contracts between DuPont and third parties or that DuPont China is otherwise capable of "alter[ing] the legal relations between [DuPont] and [a] third [party]."  Restatement (Second) of Agency § 12.  Also, as discussed earlier, there is no evidence that DuPont controlled the overall manufacturing process, only that it controlled limited aspects of that process—setting the specification for raw materials, qualifying third-party suppliers, requiring COAs, and investigating problems with the product.  *See* Hr'g Tr. 45:12–49:08.  There is insufficient control to establish an agency relationship as to the manufacture of Zytel FR50.  *See, e.g.*, *Sonora Diamond Corp. v. Superior Ct.,* 83 Cal. App. 4th 523, 542 (Cal. Ct. App. 2000) ("[To establish an agency relationship] the parent must be shown to have moved beyond the establishment of general policy and direction for the subsidiary and in effect taken over performance of the subsidiary's *day-to-day* operations in carrying out that policy.").

Arcelik has failed to adduce evidence sufficient to create a genuine question of fact as to whether DuPont is liable for Arcelik's negligent manufacture claim, and the undisputed facts establish that Arcelik cannot prevail on this claim.

### B.     Negligent Misrepresentation and DCFA Claims

Arcelik argues that DuPont is liable for negligent misrepresentation both under common law and the DCFA.  Its sole theory under both its negligent misrepresentation and DCFA claims is one of concealment or omission, not affirmative misrepresentation.  *See* Pl.'s Opp'n 19, 21. Arcelik contends that DuPont failed to disclose that it "did not have quality control measures in place to detect ionic contamination" in the Zytel FR50 product information sheets that DuPont distributed to its customers and which Arcelik obtained through EPCOS in 2006.[12]  *Id.* at 20; Hr'g Tr. 14:03–14, 15:06–16:02.

DuPont argues that the misrepresentation by omission claim was not properly raised and, in any event, is without merit because DuPont did not have a duty to disclose the information Arcelik claims was omitted.  *See* Def.'s Reply 7.  As DuPont explains, it "has explicit specifications for its product" in the product information sheets and "[i]onic content is not one of them."  *Id.* at 9 (citing Def.'s Ex. 15–17 and Lawton Tr. 105:03–106:13).

The common law negligent misrepresentation claim was not properly raised in this litigation.  There was no allegation of an omission under negligent misrepresentation in the Amended Complaint. *See* Am. Compl. ¶¶ 74–83.  Instead, Arcelik's theory as to its common law negligent misrepresentation claim in the Amended Complaint was that DuPont made affirmative

---

[12] "Beginning in 2006, Arcelik undertook a suitability assessment to determine whether the Epcos [] capacitors incorporating Zytel FR50 were suitable for use in its dryers."  Pl.'s Ex. 14, at 17.

misrepresentations about Zytel and its capabilities in the product information sheets that it supplied to "direct purchasers, end-users, and other industry participants, including Arcelik," with the purpose of "inducing" them to "purchase Zytel." *Id.* at ¶ 75; *see id.* ¶¶ 74–83. "DuPont failed to exercise reasonable care or competence in obtaining and communicating the [above] information," Arcelik alleged, "because it had no process for measuring, and did not measure, Zytel's electrical resistivity, and therefore had no basis for believing that Zytel's reported electrical properties were accurately reflected by, or would remain consistent with, published data." *Id.* ¶ 82.

When asked in written discovery to "[i]dentify each document from DuPont that Arcelik contends contains a fraudulent statement, intentional misrepresentation, or negligent misrepresentation," *see* Pl.'s Ex. 14, at 31, Arcelik identified six documents it would produce in response to that interrogatory, including the product information sheets, *id.* at 32. Again, Arcelik said nothing about its theory resting on an omission.

Finally, in its opposition to DuPont's motion to dismiss, Arcelik taxed DuPont for relying on case law involving negligent misrepresentation of facts by omission, contending that those cases involved a "different claim[]" than the one Arcelik was making (of affirmative misrepresentation). Pl.'s Mem. Opp'n to Def's Mot. to Dismiss, D.I. 31, at 12 ("*Outdoor*,[13] however, involved different claims that the defendant had 'negligently misrepresented facts *by omission*.'").

Arcelik cannot now, after the time to amend the pleadings has expired and after discovery has concluded, decide that it would like to plead its common law claim under a theory of omission—something that it expressly stated it was not doing at the motion to dismiss stage. *See*

---

[13]  *See Outdoor Techs., Inc. v. Allfirst Fin., Inc.*, No. 99C-09-151-JRS, 2001 WL 541472 (Del. Super. Ct. Apr. 12, 2001).

*Whitaker*, 2013 WL 6002067, at *7; *see also Miranda-Rivera*, 813 F.3d at 76 ("Plaintiffs may not

'raise new and unadvertised theories of liability for the first time in opposition to a motion for

summary judgment.'" (quoting *Calvi*, 470 F.3d at 431)).  However, with respect to only the DCFA

claim, Arcelik did allege that "DuPont also concealed or omitted material facts, including the fact

that it had no process for measuring the electrical-resistivity characteristics or detecting ionic

contamination of Zytel . . . ."  Am. Compl. ¶ 95.

Even assuming that the theory has been properly raised as to both the common law and the

DCFA claims, it fails on the merits.  The parties agree that the negligent misrepresentation and the

DCFA claim rise and fall together.  *See* Hr'g Tr. 30:10–14.  Although there are material

distinctions in the standards required to prove the two claims—e.g., an individual can be liable

under the DCFA without satisfying all of the elements of common law misrepresentation[14]—both

require proof that there was an omission in the face of a duty to speak.  The lack of such evidence

in this case is fatal to both claims.

To assert a claim for negligent misrepresentation under Delaware common law, the

following elements must be present:

> 1) a particular duty to provide accurate information, based on the plaintiff's
> pecuniary interest in that information; 2) the supplying of false information; 3)
> failure to exercise reasonable care in obtaining or communicating information; and
> 4) a pecuniary loss caused by justifiable reliance upon the false information.

---

[14]   "The statute [] depart[s] from the common law in the following ways: (1) 'a negligent
misrepresentation is sufficient to violate the statute,' (2) a violation of the statute 'is committed
regardless of actual reliance by the plaintiff,' and (3) the plaintiff need not show 'intent [by the
defendant] to induce action or inaction by the plaintiff.'" *Eames v. Nationwide Mut. Ins. Co.*, 412
F. Supp. 2d 431, 437 (D. Del. 2006) (quoting *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069,
1074 (Del. Super. Ct. 1983)).  Only the latter two differences distinguish the statute from common
law negligent misrepresentation.

*H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 147 n.44 (Del. Ch. 2003); *see also Pa. Emp., Benefit Tr. Fund v. Zeneca, Inc.*, 710 F. Supp. 2d 458, 485–86 (D. Del. 2010); Restatement (Second) of Torts § 552(1) (1977).   The supplying of false information includes a material omission.   *See Stephenson*, 462 A.2d at 1074.   Under § 551(1) of the Restatement (Second) of Torts,

> One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, *if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.*

(emphasis added).   A duty to speak can be created by a pre-existing relationship between two parties (e.g., a business or fiduciary relationship between the two), *see, e.g.*, *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 156 (Del. Ch. 2004) (discussing "disclosure-related duties of the fiduciaries of Delaware business entities"),[15] or through a partial disclosure of facts that requires the disclosure of additional facts to prevent a misleading impression, *see Stephenson*, 462 A.2d at 1074 ("[O]ne is equally culpable . . . who by omission fails to reveal that which it is his duty to disclose in order to prevent statements actually made from being misleading."); *see also Morris Aviation, LLC v. Diamond Aircraft Indus., Inc.*, 536 F. App'x 558, 569 (6th Cir. 2013) ("A non-contractual party does not have the duty to say anything, but once a partial disclosure is made he must 'tell the whole truth.'").

---

[15]   It is unclear whether an ordinary business relationship, absent a fiduciary duty, is sufficient to give rise to a duty to disclose.   *See, e.g.*, *Off. Furniture Rental All., LLC v. Liberty Mut. Fire Ins. Co.*, 981 F. Supp. 2d 111, 120 (D. Conn. 2013) ("The duty to disclose correct information arises from a closer degree of trust and reliance than in the ordinary business relationship." (internal quotation marks and citation omitted)); *Canpartners Invs. IV, LLC v. All. Gaming Corp.*, 981 F. Supp. 820, 826 (S.D.N.Y. 1997) ("[U]nder New York law[,] a duty to disclose exists when a confidential, fiduciary or other 'special' relationship exists among the parties. . . . Regular business relations[] . . . do not rise to the level of a special relationship without more.").

The standard is, in this respect, the same for a claim under the DCFA. *See Carroll v. Philip Morris USA, Inc.*, 163 A.3d 91, 105 (Del. Super. 2017) ("The DCFA draws no distinction between affirmative misrepresentation and fraudulent concealment, but instead designates both as violations of state law.").   "Section 2513 of the DCFA makes certain things done in connection with the sale, lease or advertisement of any merchandise an unlawful practice." *Sammons v. Hartford Underwriters Ins.*, No. S09C-12-026-RFS, 2010 WL 1267222, at *1 (Del. Super. Ct. Apr. 1, 2010).  It prohibits, among other things,

> *the concealment, suppression, or omission* of any *material* fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale, lease, receipt, or advertisement of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is an unlawful practice.

6 Del. C. § 2513(a) (emphasis added).  The deliberate concealment of a material fact must be done "in the face of a duty to speak." *Nicolet, Inc. v. Nutt*, 525 A.2d 146, 149 (Del. 1987) (citing *Stephenson*, 462 A.2d  at 1074).

In this case, Arcelik has presented no evidence that there was a direct business or fiduciary relationship between DuPont and Arcelik. *See* Pl.'s Opp'n 21; Hr'g Tr. 12:19–13:05, 14:17–16:02. Arcelik purchased the capacitors containing the allegedly defective Zytel FR50 from EPCOS, a company not owned or controlled by DuPont.  The issue thus turns on whether DuPont partially disclosed facts (to Arcelik) such that it had a duty to disclose its purportedly lacking quality control processes.  Arcelik has not provided evidence that DuPont made such a partial disclosure.

Arcelik's theory is that DuPont "fail[ed] to disclose [] critical quality control laxities" in its Zytel FR50 product information sheets, which DuPont distributed to customers and which Arcelik received from EPCOS before purchasing the electrical capacitors.  Pl.'s Opp'n 20; Hr'g

Tr. 14:03–14, 15:06–16:02.  The information sheets list the specifications for Zytel FR50 and include the results of several tests DuPont conducted that are unrelated to the alleged defects in this case.  Def.'s Exs. 15–17.  There is no indication on the face of the product information sheets that DuPont had a specification for the flame retardant within the Zytel FR50 or that it tested for compliance with that specification generally or for ionic contamination in particular.  Under these circumstances, the court sees no disclosure in the product information sheets that would give rise to a duty that DuPont disclose the lack of tests concerning ionic contamination.[16]

While, as discussed above, DuPont had specifications for raw materials, including the flame retardant and the percentage of bromide,[17] that third-party suppliers had to certify satisfying, *see* Lawton Tr. 108:15–19, Arcelik has produced no evidence that those internal specifications were ever transmitted to Arcelik, and indeed, it admits they were not, *see* Hr'g Tr. 63:05–64:01 (agreeing testing for compliance with internal specifications is "not information that would have been shared directly with Arcelik"); *see also id.* at 63:08–10 ("There [were not] any direct communications between DuPont and Arcelik [around 2008 when Arcelik was considering purchasing the EPCOS capacitors].").[18]

---

[16]  Nor has Arcelik pointed to evidence in the record showing that Arcelik actually relied on the information in the product information sheets in purchasing the capacitors, a requirement for showing common law negligent misrepresentation.  *See H-M Wexford*, 832 A.2d at 142.  The Arcelik research and development engineers who were involved in the approval of the EPCOS capacitors for use in the Arcelik dryers testified that it was a combination of things, including EPCOS's reputation and product information sheets for the capacitors, as well as tests conducted by both Arcelik and EPCOS that led Arcelik to approve the EPCOS capacitors for use in its dryers.  Ozgurel Tr. 33:16–34:24, 44:09–46:21; Dep. of Safak Tezcan Pl.'s Ex. 8, at 40:11–45:13.  Arcelik's common law negligent misrepresentation claim thus also fails on the justifiable reliance prong.  *See, e.g.*, *H-M Wexford*, 832 A.2d at 142–143 (showing that a claim fails as a matter of law where there is no claim of justifiable reliance).

[17]  Arcelik also complains that "DuPont had no specification for measuring free sodium."  *See* Pl.'s Opp'n 20 (citing Lawton Tr. 268:14–16).

[18]  This same reasoning applies to Arcelik's suggestion (for the first time at oral argument) that DuPont's 2008 notice to its customers regarding a change in flame retardant that resulted in a color

The court grants Defendant's motion for summary judgment on Arcelik's negligent misrepresentation and DCFA claims.

C.     Tortious Interference with a Contract

Finally, the court addresses Arcelik's tortious interference with a contract claim.  In its opposition brief and at oral argument on DuPont's motion for summary judgment, Arcelik redefined its claim.[19]   Arcelik contends that even though DuPont (1) alerted its customers, including EPCOS, of the problems it had discovered with the flame resistance on or about October 26, 2012; (2) did not restrict the dissemination of that information, *see* Pl.'s Ex. 27; Hr'g Tr. 74:02–18; and (3) that information was communicated to Arcelik, *see* Hr'g Tr. 74:15–17, a "Direct Material Supplies Quality Agreement" incorporated in the EPCOS-Arcelik contract required EPCOS to immediately supply Arcelik with a report detailing the cause of the problem.[20]

---

change to the Zytel FR50 was a partial disclosure that gave rise to a duty for DuPont to notify customers every time there was a change with suppliers.  *See* Hr'g Tr. 63:03–04, 69:20–71:10.  In 2008, DuPont notified EPCOS of a flame retardant change that resulted in a color change to the Zytel FR50.  *See* Mayo Tr., Pl.'s Ex. 3, at 112:02–09.  Arcelik does not contend that DuPont ever notified Arcelik of that change, *see* Hr'g Tr. 69:20–22, 71:01–03 ("DuPont t[old] EPCOS' sales marketing team that there [had been] a change in [the flame retardant supplier's product]."), and therefore DuPont owed no duty to notify Arcelik of further change with respect to the flame retardant supplier or its product.

[19]   In its Amended Complaint, Arcelik alleged that DuPont knew about the 2009 contract between Arcelik and EPCOS that "required [EPCOS] to supply capacitors possessing certain specifications related to their electrical capabilities, including the capability of performing . . . in hot and humid conditions," and interfered with that contract through its "misrepresentations about Zytel's electrical capabilities and its sale of defective Zytel," which "caused [EPCOS] not to perform its contractual obligations."  Am. Compl. ¶¶ 107–110.  Arcelik no longer asserts this theory.  *See* Pl.'s Opp'n 23–25 (arguing only that "DuPont's intentional concealment of the investigation report (i) prevented EPCOS from making a timely and complete disclosure to Arcelik regarding the total impact of the defective Zytel FR50 on EPCOS' capacitors and Arcelik's use of them in its dryers, and (ii) impeded EPCOS from ensuring that its capacitors met defined standards and buying specifications for use in Arcelik's high heat, high humidity dryers.").

[20]   According to Arcelik, that provision required EPCOS to "report examinations made to find the root cause of a defect."  Hr'g Tr. 72:06–10; Pl.'s Ex. 49, at 4, 12.  The language of the provision in question is somewhat opaque, requiring the supplier (EPCOS) to warrant that the materials

Arcelik's theory as to how DuPont's intentional acts caused EPCOS to breach that provision is two-fold.  First, Arcelik contends that DuPont intentionally concealed its "root cause" investigation report from EPCOS until February 2013, despite the fact that it had completed an investigation report in September 2012 detailing the issues with the defective Zytel FR50 and that the September 2012 report "was 'the same' as the [root cause] investigation report provided to EPCOS [in February]."  Pl.'s Opp'n 24–25 (citing Pl.'s Ex. 48).  Second, even when DuPont finally shared the investigation report with EPCOS in February 2013, Arcelik contends, "DuPont went so far as to prohibit its customers, *i.e.*, EPCOS, from sharing critical root cause information[, *i.e.*, the report,] with their customers, *i.e.*, Arcelik," until March 2013.  *Id.* at 9 (citing Pl.'s Ex. 34, at DUP0003347); *see* Hr'g Tr. 16:15–17:03; *see also* Pl.'s Ex. 43 (EPCOS's March 1, 2013 notice of the safety hazard to Arcelik).[21]

"Under Delaware law, a claim for tortious interference with a contract has five elements: (1) a valid contract; (2) about which the defendants have knowledge; (3) an intentional act by the defendants that is a significant factor in causing the breach of the contract; (4) done without justification; and (5) which causes injury."  *Gill v. Del. Park, LLC*, 294 F. Supp. 2d 638, 645 (D. Del. 2003); *see also* Restatement (Second) of Torts § 766 cmt. i ("To be subject to liability [for inducing a breach of contract], the actor must have knowledge of the contract with which he is interfering and of the fact that he is interfering with the performance of the contract.").  DuPont moves for summary judgment on the grounds that Arcelik has failed to satisfy the second and third

---

supplied for Arcelik's products are free from defect and that for "defects originating from [EPCOS]," "[e]xaminations made to find the root cause of the defect shall be reported to Arcelik [by EPCOS]."  The court assumes for the purposes of summary judgment that Arcelik's characterization of its requirements is accurate.

[21] It is unclear what damage the second alleged breach caused Arcelik since it had already recalled the affected dryers as of mid-November 2012.  *See* Pl.'s Ex. 14, at 30.

elements—that DuPont had knowledge of the EPCOS-Arcelik contract and that it committed an "intentional act" that was a "significant factor in causing the breach of the contract." *Gill*, 294 F. Supp. 2d at 645; *see* Def.'s Mot. 23.

Arcelik's claim founders on the knowledge prong, so the court need not address the intentional act prong.[22]  In the summary judgment briefing, the parties dispute the relevance and admissibility of two pieces of evidence pertaining to knowledge:  (1) a statement made by Joo Young Park, an employee of DuPont's Korean subsidiary, who purportedly testified that DuPont knows "everything about the use of customers" (and later corrected that testimony to state that DuPont does *not* know everything about the use of its customers), *see* Pl.'s Ex. 5, at 143:6–7; and (2) a March 5, 2013 email in which a Turkish employee of another DuPont subsidiary, Duygu Turkes, refers to Arcelik as "our winning customer," *see* Pl.'s Ex. 45.  Arcelik maintains that this evidence shows that "DuPont knew about the Arcelik/EPCOS contract, whether because it considered Arcelik to be a customer and therefore knew 'everything about' Arcelik's use of EPCOS capacitors containing Zytel FR50, or because it considered EPCOS to be a customer and therefore knew 'everything about' EPCOS' manufacture of capacitors containing Zytel FR50 for use in Arçelik's dryers."  Pl.'s Opp'n 23.

This evidence is insufficient to establish that DuPont had knowledge of the Arcelik-EPCOS contract before February 2013—necessary for Arcelik's first theory.  General statements about knowledge of customer "use" of a product by an employee of a Korean subsidiary is not evidence of knowledge of specific contracts by another subsidiary in China.  As to the second theory—the

---

[22]  It is also unclear how the failure to provide the root cause report to EPCOS before February 2013 could have caused EPCOS to breach the contract.  EPCOS would only have been in breach of the contract if it had the root cause report or information from the root cause report and failed to notify Arcelik.  EPCOS had no duty to inform Arcelik of information not in its possession.

withholding of the root cause investigation report between February and March—at oral argument, counsel for DuPont conceded that DuPont had knowledge of the contract as of February 2013. Hr'g Tr. 83:01–05.  However, although DuPont may have known of the existence of an EPCOS-Arcelik contract for the purchase of capacitors by February 2013, Arcelik has pointed to no evidence showing that DuPont knew of the relevant provision of the EPCOS-Arcelik contract that allegedly required EPCOS to immediately provide any reports relating to capacitor problems to Arcelik (*i.e.*, the Direct Material Supplies Quality Agreement).

Although there is limited case law on this issue in Delaware, courts in other jurisdictions require the alleged tortfeasor to have knowledge of the specific terms of a contract with which it is accused of interfering.  *See, e.g.*, *Medtech Prods. Inc. v. Ranir, LLC*, 596 F. Supp. 2d 778, 797 (S.D.N.Y. 2008) (finding "general claim of [a defendant's] knowledge of the contracts" insufficient to show that defendant "was aware of the limitations [the contracts] imposed"); *Corning Inc. v. Shenzhen Xinhao Photoelec. Tech. Co.*, 546 F. Supp. 3d 204, 212 (W.D.N.Y. 2021) ("[T]he alleged tortfeasor's knowledge that *some* contract existed is insufficient. . . . [T]he plaintiff must plead . . . some knowledge of the terms and conditions of the allegedly interfered-with contract." (internal quotation marks and citation omitted)); *Wellington Shields & Co. v. Breakwater Inv. Mgmt.*, No. 14-cv-7529-RJS, 2016 WL 5414979, at *4 (S.D.N.Y. Mar. 18, 2016) ("Plaintiff must show that Defendants had actual knowledge of the terms of the contract and of the contractual obligation that was allegedly breached . . . ."); *Discovery Commc'ns, LLC v. Computer Scis. Corp.*, No. DKC 12-2894, 2013 WL 3448076, at *3 (D. Md. July 8, 2013), *aff'd*, 570 F. App'x 306 (4th Cir. 2014) ("In Maryland, for a party to know it is interfering with the performance of a contract, the actor must have knowledge of the contractual duty with which he is interfering."); *Mission Toxicology, LLC v. Unitedhealthcare Ins.*, 499 F. Supp. 3d 350, 364 (W.D. Tex. 2020)

22

("[T]he alleged interferer must at least have knowledge that would lead a reasonable person to believe in both the existence of the contract and the relevant terms, i.e., plaintiff's interest in the contract."). Delaware courts routinely follow common law in other jurisdictions, *see, e.g.*, *Japan Petroleum*, 456 F. Supp. at 839; *Mobil Oil*, 718 F. Supp. at 267–68, and the court sees no reason why Delaware courts would not do so in this instance and require knowledge of the specific contract provision in question.

Here, Arcelik has produced no evidence showing that even after February 2013, DuPont had any knowledge of the contract beyond its mere existence and that it covered the sale of capacitors. At oral argument, counsel for Arcelik stated that he "th[ought]" DuPont's knowledge of the terms could be "inferred" from the fact that DuPont instructed EPCOS not to share the root cause investigation report with its customers. *See* Hr'g Tr. 96:03–97:03.[23] DuPont did not instruct EPCOS not to share it with its customers, specifically, but "with *any other party*[,] without the prior consent of DuPont." *See* Pl.'s Ex. 34, at 1, 3 (emphasis added). There is no evidence that would support an inference that DuPont was aware of the alleged contractual obligation on the part of EPCOS to provide Arcelik with copies of a specific report related to problems.

The court thus holds that Arcelik has not produced evidence sufficient to create a genuine dispute of material fact as to the knowledge element of its tortious interference claim, and grants summary judgment on this claim.

---

[23] Court: ". . . there's no evidence, is there, that DuPont was aware of the provision of that contract requiring notification?"

   Counsel for Arcelik: "I think it can be inferred from the fact that DuPont is instructing EPCOS not to share it with its customers. I think DuPont knows that in all of the contracts between its customers and their customers, that it is probably standard, if not common, not standard -- that a manufacturer such as EPCOS would have to provide to its end customer -- like Arcelik -- information in the form of an investigative report relating to the product that EPCOS provides to Arcelik. Yes. I think DuPont knows that."

## CONCLUSION

For the foregoing reasons, the court GRANTS DuPont's Motion for Summary Judgment, D.I. 187.  A final appealable order accompanies this memorandum opinion.


Dated:  August 5, 2022

Honorable Timothy B. Dyk
United States Circuit Judge, sitting by designation